[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 08, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-10180

_____

D.C. Docket No. 00-02116-CV-FAM

31 FOSTER CHILDREN, on behalf
of themselves and all other Children
in Florida Foster Care,

                                        Plaintiffs-Appellants,

versus

JEB BUSH, as Governor of the State
of Florida, KATHLEEN KEARNEY,
as Secretary of the Florida Department
of Children and Families, CHUCK
BATES, District Administrator, ROBERT
WILLIAMS, District Administrator,
ESTER TIBBS, District Administrator,
et al.,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

**(May 8, 2003)**

Before ANDERSON and CARNES, Circuit Judges, and HAND*, District Judge.

CARNES, Circuit Judge:

This case involves a proposed class action brought on behalf of all children in Florida's foster care system against the Governor of Florida, the Secretary of Florida's Department of Children and Families ("the Department"), and the administrators of fourteen of the Department's fifteen districts, all of whom collectively administer Florida's foster care system. The individual plaintiffs' amended complaint alleges widespread deficiencies in the state's foster care system, in violation of the United States Constitution and federal statutory law. The plaintiffs appeal the district court's order insofar as it grants the defendants' motions to dismiss parts of the amended complaint on grounds of Younger v. Harris abstention and Eleventh Amendment immunity.

In Part I of this opinion, we set out the allegations contained in the multi-count complaint and the procedural history of the case. In Part II, we address the justiciability concerns raised by the defendants and conclude that although the claims of two of the plaintiffs are moot, the other plaintiffs have standing to pursue their claims. In Part III, we review the plaintiffs' federal statutory claims and

—————————————

*Honorable William B. Hand, United States District Judge for the Southern District of Alabama, sitting by designation.

2

affirm the district court's order dismissing those claims, because the statutes at issue do not give rise to enforceable rights. In Part IV, we discuss the <u>Younger</u> abstention doctrine and conclude that the district court did not abuse its discretion in abstaining from deciding the plaintiffs' claims. Part V contains our conclusions and instructions for the district court on remand.

## I. THE COMPLAINT AND PROCEDURAL HISTORY

In June of 2000, the plaintiffs filed suit on behalf of themselves and a statewide class of children in custody of the defendants. The amended complaint contains six counts, alleging that the defendants' practices deny and threaten the plaintiffs'[1] claimed rights to: (1) safe care that meets their basic needs, prompt placements with permanent families, and services extended after their eighteenth birthdays, as guaranteed by substantive due process (Count I); (2) procedural due process in determining the services they will receive (Count II); (3) family association with siblings as guaranteed by the First, Ninth, and Fourteenth Amendments (Count III); (4) prompt placement with permanent families and to have their medical and educational backgrounds provided to their care givers, as

---

[1]The plaintiffs who filed the amended complaint are: Bonnie L., Reggie B., Rebecca B., Laurie S., Lillie S., Leslie F., Sandra M., Tanya M., Candice D., Jay D., Matthew I., Hugh S., Leanne G., Tammy G., Elaine R., Paul B., Rachel C., Cathy W., Larissa C., John J., Melinda, and Karina.

guaranteed by 42 U.S.C. §§ 675(5)(D) and (E), which are provisions of the Adoption Assistance and Child Welfare Act of 1980, Pub. L. No. 96-272, 94 Stat. 500, 516 (June 17, 1980) (codified as amended at 42 U.S.C. §§ 620-628 and §§ 670-679a) ("the Adoption Act") (Count IV); (5) health screening and followup under schedules established pursuant to the Medicaid Act, 42 U.S.C. §§ 1396a(a)(43)(B), 1396(a)(43)(C), and 1396d(r) (Count V); and (6) in the case of the black plaintiff foster children, freedom from racial discrimination in the provision of care and services, as guaranteed by Title VI of the 1964 Civil Rights Act (Count VI).

The plaintiffs brought their lawsuit under 42 U.S.C. § 1983, seeking declaratory and injunctive relief relating to the operation of Florida's foster care system. Specifically, they requested that the court:

(1) declare unconstitutional and unlawful the following alleged practices: (a) the failure to provide for the plaintiffs' basic needs, safety, freedom from harm, freedom from unreasonable restraints on their liberty, care and treatment, freedom from being placed into unnecessary state-created danger, and freedom from arbitrary and capricious actions and decisions that deprive them of benefits to which they are entitled; (b) deprivation of state-created entitlements without an adequate and fair procedure; (c) unnecessary separation of siblings and denial of

4

visitation among them; (d) failure to comply with the Adoption Act and the Medicaid Act; and (e) discrimination on the basis of race;

(2) enjoin the Department and the defendants from violating the plaintiffs' constitutional rights, including those described in (1) above;

(3) order appropriate remedial relief to ensure compliance with the Constitution and laws of the United States;

(4) appoint an expert panel to develop and oversee the implementation of a plan for reform;

(5) appoint a permanent ombudsman or children's advocate to present the plaintiffs' interests to the defendants, and require the defendants to meet regularly and frequently with that ombudsman; and

(6) grant other equitable relief as the court sees fit.

After amending the complaint, the plaintiffs moved to certify the statewide class of all children who are or would be in foster care in Florida, along with a subclass of black children.[2] Upon motion of the defendants, the court appointed a guardian ad litem, who concluded after investigation that "a class action lawsuit is an appropriate mechanism to secure a remedy for all the children in State custody .

---

[2]The class description was later modified to exclude children who were plaintiffs in a separate class action involving only children in foster care in Broward County.

5

. . [and] that the prosecution of this lawsuit to a final resolution . . . will be in the best interests of the Plaintiff children and the class they represent."

The district court dismissed all of the plaintiffs' claims on the pleadings. It ruled that Count IV, which involves the Adoption Act claims, is barred by the Eleventh Amendment and dismissed those claims with prejudice. The court also dismissed with prejudice the constitutional claims – Counts I, II, and III – as to all plaintiffs who are not in extended foster care (which exists only for persons age 18 or older); it did so based upon the abstention doctrine of Younger v. Harris, 401 U.S. 37, 91 S. Ct. 746 (1971). The court dismissed with prejudice the portion of Count VI that alleges disparate impact discrimination under Title VI of the Civil Rights Act of 1964. Concluding that the amended complaint was not a "short and plain statement" of claims, the court dismissed all the other claims (including the Title VI claims for intentional discrimination) in the amended complaint without prejudice, granting the plaintiffs leave to replead those claims that had not been dismissed on some other basis.

Thereafter, eleven of the twenty-two named plaintiffs who had filed the amended complaint settled all of their claims, executed a release, and are no longer part of the lawsuit. Some of the eleven plaintiffs who remain in the lawsuit also settled some of their claims. More specifically, all the intentional racial

6

discrimination claims and all the Medicaid Act claims have been settled and dismissed.[3] The settlement left no unadjudicated claims pending in the district court.

The plaintiffs who appealed to this Court are the remaining eleven named plaintiffs still in foster care in Florida for persons under the age of eighteen.[4] The issues they raise in this appeal concern only Counts I through IV, which involve some of the claims that were dismissed with prejudice.[5]

## II. JUSTICIABILITY

Initially, we are faced with some threshold questions about whether the plaintiffs' claims present a justiciable case or controversy. Specifically, we must decide whether the claims of two of the plaintiffs are moot and whether the other plaintiffs have standing to challenge the practices at issue.

## A. MOOTNESS

---

[3]Because of that settlement, none of the plaintiffs filed an amendment to the complaint repleading those claims, even though the district court's dismissal of them had been without prejudice.

[4]They are: Reggie B., Rebecca B., Laurie S., Lillie S., Tanya M., Leanne G., Tammy G., Elaine R., Rachel C., Larissa C., and John J.

[5]Although the disparate impact portion of the black children's Title VI claims in Count VI was also dismissed with prejudice, the plaintiffs do not contest that ruling.

The exercise of jurisdiction by the federal courts "depends upon the existence of a case or controversy." North Carolina v. Rice, 404 U.S. 244, 246, 92 S. Ct. 402, 404 (1971) (citation and internal quotation marks omitted). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496, 89 S. Ct. 1944, 1951 (1969). "Put another way, [a] case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehabilitative Servs., 225 F.3d 1208, 1217 (11th Cir. 2000) (citations and internal quotation marks omitted). We consider questions of mootness under a plenary standard of review. United States v. Fla. Azalea Specialists, 19 F.3d 620, 621 (11th Cir. 1994).

The defendants contend that Larissa C.'s and Leanne G.'s claims are moot, and we agree. Because Larissa C. and Leanne G. have been adopted, they are no longer in the defendants' legal or physical custody and therefore cannot be further harmed by the defendants' alleged illegal practices. Because the plaintiffs' amended complaint seeks only prospective injunctive relief against the defendants to prevent future harm, no live controversy exists between them and these two

8

plaintiffs. Larissa C. and Leanne G. have no legally cognizable interest in the outcome of this lawsuit. All of their claims are moot.

## B. STANDING

The three prerequisites for standing are that: (1) the plaintiff have suffered an "injury in fact" – an invasion of a judicially cognizable interest, which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) there be a causal connection between that injury and the conduct complained of – the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) it be likely, not merely speculative, that the injury will be redressed by a favorable decision. Bennett v. Spear, 520 U.S. 154, 162, 117 S. Ct. 1154, 1161 (1997). These three elements "constitute[] the core of Article III's case-or-controversy requirement." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 103-04, 118 S. Ct. 1003, 1017 (1998).

The plaintiffs bear the burden of establishing each of the three standing elements. Bennett, 520 U.S. at 167-68, 117 S. Ct. at 1163-64. How much evidence is necessary to satisfy that burden depends on the stage of litigation at which the standing challenge is made. Id. At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to

9

dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S. Ct. 2130, 2137 (1992) (citations and internal marks omitted).

Because Larissa C.'s and Leanne G.'s claims are moot, we have nine remaining plaintiffs who appealed to this Court and for whom the standing question matters: Reggie B., Rebecca B., Laurie S., Lillie S., Tanya M., Tammy G., Elaine R., Rachel C., and John J. Taking the allegations of the complaint as true for present purposes, as we must, Pompey v. Broward County, 95 F.3d 1543, 1548 n.6 (11th Cir. 1996), we will proceed count-by-count as to all the injury claimed by the plaintiffs who have appealed to this Court.

In Count I, the plaintiffs claim that the defendants have violated their substantive due process rights by engaging in a pattern and practice of failing to meet their obligations in the following ways: failing to satisfy the plaintiffs' basic needs for food, clothing, and shelter, as well as for medical, educational and other services; failing to provide safe care and placements that protect the plaintiffs from harm and services that prevent or ameliorate harm; and failing to provide the plaintiffs with care consistent with the purposes for which the defendants assumed custody of them.

10

As additional claimed violations of their substantive due process rights in Count I, eight of the nine remaining plaintiffs – Tanya M., Laurie S., Lillie S., Elaine R., Rachel C., Reggie B., John J., and Tammy G. – assert that the defendants knowingly placed and retained them in foster care placements that were dangerous, abusive, neglectful, overcrowded, or wholly inappropriate for meeting the children's needs. The plaintiffs further claim that the defendants ignore or inappropriately respond to complaints or other information identifying certain placements as dangerous, abusive, neglectful, overcrowded, or wholly inappropriate for meeting the children's needs, and have done so in the placements of Tanya M., Laurie S., Lillie S., Tammy G., and John J. Further, the defendants are alleged to have engaged in a pattern and practice of placing some children, including Rachel C. and Tammy G., in temporary shelters or group homes on a long-term basis because of the unavailability of foster homes to accommodate them. They are alleged to have retained children, including Laurie S., Lillie S., Reggie B., and Rebecca B., in foster care longer than necessary and to have subjected children to multiple, unwarranted placements. The position of the plaintiffs is that the defendants have a pattern and practice of engaging in the conduct alleged in Count I, which has caused and continues to cause the plaintiffs injury.

11

In Count II, the plaintiffs assert violations of procedural due process. They allege that the defendants have failed to establish a process for an administrative hearing or professional review of decisions that deny the plaintiffs benefits to which they are entitled, including caseworker supervision of children in foster care and shelter care, medical care, foster care after reaching the age of majority, and participation in a subsidized Independent Living Program. Specifically, it is alleged that Reggie B. has been and continues to be injured by this pattern and practice, because he has been denied treatment necessary to repair a cleft palate and for other medical needs.

In Count III, eight of the remaining plaintiffs – Tanya M., Tammy G., Laurie S., Lillie S., John J., Elaine R., Reggie B., and Rebecca B. – claim that the defendants have violated their First, Ninth, and Fourteenth Amendment rights by unnecessarily separating them from their siblings and depriving them of regular and frequent visitation with their separated siblings. They allege that the defendants have a pattern and practice of doing so, and that it has harmed them.

In Count IV, the plaintiffs allege that the defendants have violated rights granted them under the Adoption Act. Specifically, Laurie S., Lillie S., Reggie B., and Rebecca B. claim that the defendants routinely fail to initiate proceedings for termination of parental rights to children in their custody for 15 of the most recent

12

22 months as required under 42 U.S.C. § 675(5)(E), and that they have been harmed by this practice. Reggie B. also alleges specifically that his health and education records were not provided to foster parents or foster care providers immediately upon his placement in a home or facility, as required under 42 U.S.C. § 675(5)(D), and the other eight remaining plaintiffs allege generally that the defendants routinely fail to obtain the required information, update it, or provide a record of the information to each foster home or facility.

The defendants contend that none of the plaintiffs has standing to bring claims under Count II (procedural due process) or Count IV (Adoption Act). With regard to Count I (substantive due process), the defendants contend that only four plaintiffs – Laurie S., Lillie S., Reggie B., and Rebecca B. – have standing to claim that they have been in foster care longer than reasonably necessary. They contend that only three plaintiffs – Tammy G., Laurie S., and Lillie S. – have standing to bring a claim under Count III (sibling association) for failure to be placed in a foster home with their siblings. Finally, they contend that only two plaintiffs – Elaine R. and Tammy G. – have standing to raise a claim under Count III for failure to allow visitation with siblings. The defendants' basis for claiming that most plaintiffs lack standing for these claims is that most of them fail to allege either a

13

palpable injury or the imminent risk of harm.[6]  Instead, according to the defendants, most of the plaintiffs complain about past harms and seek relief for aspects of the Florida foster care system that have not caused them injury.

In order to satisfy the "injury in fact" requirement of standing, a plaintiff need not wait for an injury to occur.  An allegation of future injury satisfies this prong of standing so long as the alleged injury is "imminent" or "real and immediate" and not merely "conjectural" or "hypothetical."  Lujan, 504 U.S. at 560, 112 S. Ct. at 2136; City of Los Angeles v. Lyons, 461 U.S. 95, 101-02, 103 S. Ct. 1660, 1665 (1983).  An injury is imminent if it is likely to occur, and likely to do so immediately.  Lujan, 504 U.S. at 560, 112 S. Ct. at 2136.

When a plaintiff cannot show that an injury is likely to occur immediately, the plaintiff does not have standing to seek prospective relief even if he has suffered a past injury.  For example, in Lyons, the plaintiff sought to enjoin the use

---

[6]In addition to injury in fact, plaintiffs must also allege that their injuries are "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court," and that it is likely the injury will be redressed if the court rules in their favor. Bennett v. Spear, 520 U.S. 154, 167, 117 S. Ct. 1154, 1163 (1997).  These aspects of standing are not disputed in this case.  According to the amended complaint, the defendants' failures caused the plaintiffs' injuries and their continued failures are likely to cause further injuries.  The plaintiffs do allege that their injuries are related to the challenged conduct of the defendants.  Therefore, the alleged injuries suffered by the plaintiffs are fairly traceable to the conduct of the defendants.  In addition, the plaintiffs seek a declaratory judgment and prospective injunctive relief that will prevent the defendants from violating their constitutional and federal statutory rights.  The relief the plaintiffs seek would clearly remedy their claimed injuries.

of "chokeholds" by police officers. 461 U.S. at 98, 103 S. Ct. at 1663. The Court stated that the plaintiff's standing to seek that relief hinged on "whether he was likely to suffer future injury from the use of the chokeholds by police officers." Id. at 105, 103 S. Ct. at 1667. The Court held that the plaintiff lacked standing, because the probability of future injury was too speculative, id. at 106-07, 103 S. Ct. at 1667-68, explaining:

> In order to establish an actual controversy in this case, [the plaintiff] would have had not only to allege that he would have another encounter with the police but also to make the incredible assertion either (1) that all police officers in Los Angeles always choke any citizen with whom they happen to have an encounter . . . or (2) that the City ordered or authorized police officers to act in such manner.

Id. at 105-06, 103 S. Ct. at 1667. As Lyons illustrates, future injury that depends on either the random or unauthorized acts of a third party is too speculative to satisfy standing requirements. However, when the threatened acts that will cause injury are authorized or part of a policy, it is significantly more likely that the injury will occur again. See id. at 106, 103 S. Ct. at 1667 (plaintiff may have had

15

standing if he had alleged "that the City ordered or authorized police officers to [perform illegal chokeholds]").

This case is more like Church v. City of Huntsville, 30 F.3d 1332 (11th Cir. 1994), than Lyons. In Church, the plaintiffs were homeless persons who sought an injunction against the City of Huntsville to prevent the City and its employees from harassing, intimidating, detaining, and arresting them solely because they were homeless, as part of a concerted effort to drive them out of the city. Id. at 1335. We held that the plaintiffs had standing, because they were far more likely than the Lyons plaintiff to have future encounters with the police, were homeless involuntarily, and could not "'avoid future exposure to the challenged course of conduct'" in which the City engaged. Id. at 1338 (quoting O'Shea v. Littleton, 414 U.S. 488, 497, 94 S. Ct. 669, 677 (1974)). Importantly, the Church plaintiffs alleged that municipal policy authorized the constitutional deprivations they claimed and that the City had a "custom, practice and policy" of engaging in the challenged conduct. Id. at 1339.

For the reasons that the Church plaintiffs had standing, the plaintiffs in this case who are in the defendants' physical custody have standing to pursue their substantive due process claims (Count I). The plaintiffs who are in the defendants' physical custody and have siblings in the defendants' custody – Tammy G., Laurie

16

S., Lillie S., John J., Reggie B., and Rebecca B. – have standing to pursue their sibling association claims (Count III). These plaintiffs are in much the same legal position as the Church plaintiffs. They are in the custody of the defendants involuntarily and will be until they are returned to their parents, are adopted, or reach the age of majority. They cannot avoid exposure to the defendants' challenged conduct. The alleged systemic deficiencies in the Florida foster care system are similar to an injurious policy, and different from the random act at issue in Lyons. The alleged pattern and practice in this case presents a substantial likelihood that the alleged injury will occur. See Church, 30 F.3d at 1339.

Moreover, the plaintiffs' allegations under Counts I and III support the conclusion that future injury will proceed with a high degree of immediacy. The Supreme Court addressed this aspect of the injury in fact requirement in Lujan, holding that because the plaintiffs failed to demonstrate their injury would "proceed with a high degree of immediacy, so as to reduce the possibility of deciding a case in which no injury would have occurred at all," they lacked standing to pursue their claim. 504 U.S. at 559, 564 n.2, 112 S. Ct. at 2135-36, 2138 n.2. Thus, under Lujan, one cannot merely allege that an injury will be suffered at "some time" in the future. However, a plaintiff need not demonstrate that the injury will occur within days or even weeks to have standing. See, e.g.,

Adarand Constructors, Inc. v. Pena, 515 U.S. 200, 211-12, 115 S. Ct. 2097, 2105 (1995) (plaintiff who was likely to suffer injury within one year period had standing to sue). The court must make a qualitative inquiry into this question. See Wilderness Soc'y v. Alcock, 83 F.3d 386, 390 (11th Cir. 1996) (when determining standing, court focuses on qualitative sufficiency of the injury). In this case, for those plaintiffs who are in the physical custody of the defendants, the degree of immediacy is sufficiently high that there is little likelihood the district court will be deciding a case "in which no injury would have occurred at all." Lujan, 504 U.S. at 564 n.2, 112 S. Ct. at 2138 n.2.

However, the two plaintiffs who are not in the defendants' physical custody lack standing to pursue the constitutional claims under Counts I and III. The amended complaint states that Tanya M. has run away, and at oral argument the plaintiffs' counsel referred to Elaine R. as one of the "hundreds of missing children." Plaintiffs who are not in the defendants' physical custody cannot demonstrate that their constitutional injuries are imminent. They may return to the defendants' physical custody, but they may not. If they do not return to the defendants' physical custody, then they will never be harmed by the alleged practices of the defendants. It follows that they cannot demonstrate any injury that would "proceed with a high degree of immediacy." Id.

18

Only Reggie B. has standing to pursue the procedural due process claims set out in Count II, because he is the only plaintiff who has demonstrated injury in fact as to that claim. He claims that he has been denied medical care to repair a cleft palate (and other unspecified medical care) and that the defendants have not provided a process for review of that denial. If his cleft palate has not been repaired, he has been denied an alleged entitlement, and he is asking for procedural protections he claims have not been provided. His is a concrete injury that is real and immediate. Id. at 560, 112 S. Ct. at 2136. The other plaintiffs, however, have not alleged that they have been denied any entitlement. Without such an allegation, the other plaintiffs are essentially asserting that they will be denied a benefit in the future, and that when that happens, the defendants will provide them with no process for reviewing the denial. The plaintiffs' procedural due process claims are different from their substantive due process claims because the procedural injury requires two steps: the defendants must deny the plaintiffs a benefit and then deny them process. Such an injury may never occur. See id. at 564 n.2, 112 S. Ct. at 2138 n.2.

As to the Adoption Act claims in Count IV, all of the plaintiffs whose parents' parental rights have not been terminated within the period set out in the statute have standing to pursue a claim under 42 U.S.C. § 675(5)(E). Their claimed

19

injury is concrete. In the amended complaint, Laurie S., Lillie S., Reggie B., and Rebecca B. present such claims. Other plaintiffs, the ones who have not been in the defendants' custody for the statutory period, do not have standing to bring a claim under § 675(5)(E), because they may not be injured at all; they may return to their parents' custody.

All of the remaining plaintiffs in the defendants' physical custody have claims under 42 U.S.C. § 675(5)(D) for the defendants' failure to provide updated health and education records to the plaintiffs' foster caregivers for the same reasons that they have standing to pursue their substantive due process claims. Because it is alleged that the defendants routinely fail to obtain the required information, update the records, and provide the information to the foster caregivers, all children who are within the defendants' physical custody are at risk of immediate harm from that pattern and practice.

In sum, Larissa C.'s and Leanne G.'s claims are moot because they have been adopted. Reggie B., Rebecca B., Laurie S., Lillie S., Tammy G., Rachel C., and John J. have standing to pursue their Count I claims. Reggie B. has standing to pursue his Count II claims. Tammy G., Laurie S., Lillie S., John J., Reggie B., and Rebecca B. have standing to pursue their Count III claims. Laurie S., Lillie S., Reggie B., and Rebecca B. have standing to pursue their Count IV claims for

20

failure to terminate parental rights in the statutory period. Reggie B., Rebecca B., Laurie S., Lillie S., Tammy G., Rachel C., and John J. have standing to pursue their Count IV claims for failure to provide updated health and education records to foster caregivers.

## III. THE PLAINTIFFS' CLAIMS UNDER § 1983 FOR VIOLATIONS OF §§ 675(5)(D) AND (E) OF THE ADOPTION ACT

Because some of the plaintiffs have standing to pursue their Adoption Act claims, we must now decide whether 42 U.S.C. §§ 675(5)(D) and (E) provide rights enforceable under 42 U.S.C. § 1983.[7] It provides a federal remedy for violations not only of the Constitution but federal statutes as well. Maine v. Thiboutot, 448 U.S. 1, 100 S. Ct. 2502 (1980). In order to have a viable cause of action under § 1983 based on the violation of a federal statute, however, a plaintiff must establish that the statute allegedly violated gives the plaintiff enforceable rights. Gonzaga Univ. v. Doe, 536 U.S. 273, 283, 122 S. Ct. 2268, 2275 (2002) (rejecting the notion

---

[7]The district court did not decide this question, instead dismissing the plaintiffs' Adoption Act claims as barred by the Eleventh Amendment under Seminole Tribe of Florida v. Florida, 517 U.S. 44, 116 S. Ct. 1114 (1996). In view of our conclusion that the Adoption Act claims are due to be dismissed on other grounds, we need not address the Eleventh Amendment issue. McClendon v. Ga. Dep't of Cmty. Health, 261 F.3d 1252, 1258-59 (11th Cir. 2002).

that case law permits "anything short of an unambiguously conferred right to support a cause of action brought under § 1983").

We emphasize, as did the Court in Gonzaga, that in cases brought to enforce legislation enacted pursuant to Congress' spending power, such as the Adoption Act, Congress must "speak with a clear voice" and manifest an "unambiguous" intent to confer individual rights before federal funding provisions will be read to provide a basis for private enforcement. Id. at 280, 122 S. Ct. at 2273 (citing Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17, 28 & n.21, 101 S. Ct. 1531, 1540, 1545 & n.21) (1981)). "In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." Pennhurst, 451 U.S. at 28, 101 S. Ct. at 1545. Only twice since Pennhurst has the Supreme Court held that spending legislation gave rise to rights enforceable via § 1983. See Wilder v. Va. Hosp. Ass'n, 496 U.S. 498, 110 S. Ct. 2510 (1990) (holding that health care providers could, pursuant to § 1983, enforce the Boren Amendment to the Medicaid Act); Wright v. Roanoke Redevelopment & Hous. Auth., 479 U.S. 418, 107 S. Ct. 766 (1987) (holding that the Brooke Amendment to the Housing Act provided a cause of action under § 1983).

The Supreme Court has set forth three requirements that must be met before a federal statute will be read to confer a right enforceable under § 1983: (1) Congress must have intended that the provisions in question benefit the plaintiff; (2) the plaintiff must demonstrate that the right assertedly protected by the statute is not so vague and amorphous that its enforcement would strain judicial resources; and (3) the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms. Blessing v. Freestone, 520 U.S. 329, 340-41, 117 S. Ct. 1353, 1359 (1997). The Supreme Court in Gonzaga clarified the first of the Blessing requirements, making it plain that only unambiguously conferred rights, as distinguished from mere benefits or interests, may be enforced under § 1983. 536 U.S. at 283, 122 S. Ct. at 2275 (rejecting the notion private plaintiffs have enforceable federal rights merely because they are the intended beneficiaries of a statute or fall within its zone of interest).

The Court held in Gonzaga that a private plaintiff could not bring an action under § 1983 to enforce provisions of the Family Educational Rights and Privacy Act of 1974 (FERPA), 20 U.S.C. § 1232g. In FERPA Congress directed the Secretary of Education to deny federal funding to any state with a policy or practice of permitting the unauthorized release of education records or personal information. Congress was explicit about it, saying: "No funds shall be made

available . . . to any [school] which has a policy or practice of permitting the release of education records . . . of students without the written consent of their parents . . . ." 20 U.S.C. § 1232g(b)(1).

In holding that FERPA does not create a right enforceable under § 1983, the Supreme Court explained that the act lacks "rights-creating" language critical to showing congressional intent to create new rights. Instead, the act speaks only to the Secretary of Education, directing him to withhold funds if the prohibited practice exists. Gonzaga, 536 U.S. at 287, 122 S. Ct. at 2277. The Court contrasted FERPA's language that "[n]o funds shall be made available," with the individually focused language of Titles VI and IX, which mandate that "[n]o person . . . shall . . . be subjected to discrimination," statutes that do create enforceable rights, see Cannon v. Univ. of Chicago, 441 U.S. 677, 99 S. Ct. 1946 (1979). The Court concluded in Gonzaga that the focus of FERPA is "two steps removed from the interests of individual students and parents." 536 U.S. 287, 122 S. Ct. at 2277. Instead of creating an enforceable duty on the part of the school, the act only imposed a duty on the part of the federal government – the duty to withhold funds.

A second reason the Supreme Court gave in Gonzaga for concluding that FERPA does not create enforceable rights is that its nondisclosure provisions speak

24

only in terms of institutional policy and practice, not about "individual instances of disclosure." Id. at 288, 122 S. Ct. at 2278. The provisions therefore have an aggregate focus, instead of a concern for "whether the needs of any particular person have been satisfied." Id. (citation omitted). Also thought significant is the fact that institutions can avoid funding termination under FERPA by substantial compliance with the act's requirements; compliance in every case is not necessary to avoid loss of funding. Id.

Finally, the Supreme Court considered in Gonzaga the mechanism that Congress chose to provide for enforcing the provisions of FERPA. The act expressly authorizes the Secretary of Education to "deal with violations" of it and to establish a review board for investigating and adjudicating such violations. 20 U.S.C. § 1232g(f). The Secretary's regulations create an office to act as a review board, and students can file individual written complaints with that office. This review mechanism, the Court concluded, evidences a congressional intent to avoid the multiple interpretations of FERPA that might arise if the act created enforceable individual rights. Gonzaga, 536 at 289-90, 122 S. Ct. at 2278-79.

We take from Gonzaga the lesson that we are to look at the text and structure of a statute in order to determine if it unambiguously provides enforceable rights. If the text and structure "provide no indication that Congress intends to create new

individual rights, there is no basis for a private suit." Id. at 286, 122 S. Ct. at 2277. If they provide some indication that Congress may have intended to create individual rights, and some indication it may not have, that means Congress has not spoken with the requisite "clear voice." Ambiguity precludes enforceable rights. Id. at 280, 122 S.Ct. at 2273. The first Blessing requirement, which is what Gonzaga addressed, is that Congress must have intended that the provision in question benefit the plaintiff. Factors to consider in determining if it did include whether the statute: (1) contains "rights-creating" language that is individually focused; (2) addresses the needs of individual persons being satisfied instead of having a systemwide or aggregate focus; and (3) lacks an enforcement mechanism through which an aggrieved individual can obtain review.

Turning to the specific legislation at hand, the Adoption Act comprises Parts B and E of Title IV of the Social Security Act and is a federal funding statute that establishes a program of payments to states for foster care and adoption assistance. 42 U.S.C. §§ 620-628, 670-679a. Sections 675(5)(D) and (E) are found in Part E. For a state to receive funds under Part E, it must satisfy certain requirements. The state must submit for approval by the Secretary of Health and Human Services a plan for foster care and adoption assistance. 42 U.S.C. § 671(a). If a state follows

its approved plan, it receives federal funds. 42 U.S.C. § 670; 42 U.S.C. § 1320a-2a.

If the state does not follow its approved plan, it may lose all or some of the federal funds it otherwise would receive. Section 1320a-2a requires the Secretary to promulgate regulations for use in reviewing state programs in order to determine whether the programs are in substantial conformity with the state plan. 42 U.S.C. § 1320a-2a(a)(3). Under the statute, the regulations must require the Secretary to withhold federal funds if a state has failed to substantially conform to its approved plan, id. § 1320a-2a(b)(3), and the regulations do exactly that, 45 C.F.R. §§ 1355.35(c)(4), 1355.36(b).

The plaintiffs in this case brought suit under § 675, a section that provides definitions for both Parts B and E, including a definition for the term "case review system." 42 U.S.C. § 675(5). The plaintiffs' position is that those provisions relating to a case review system give them an enforceable right under the statute. Section 675(5) provides, in relevant part:

The term "case review system" means a procedure for assuring that –

***

27

(D) a child's health and education record (as described in paragraph (1)(A)) is reviewed and updated, and supplied to the foster parent or foster care provider with whom the child is placed, at the time of each placement of the child in foster care;

(E) in the case of a child who has been in foster care under the responsibility of the State for 15 of the most recent 22 months, or, if a court of competent jurisdiction has determined a child to be an abandoned infant (as defined under State law) or has made a determination that the parent has committed murder of another child of the parent, committed voluntary manslaughter of another child of the parent, aided or abetted, attempted, conspired, or solicited to commit such a murder or such a voluntary manslaughter, or committed a felony assault that has resulted in serious bodily injury to the child or to another child of the parent, the State shall file a petition to terminate the parental rights of the child's parents (or, if such a petition has been filed by another party, seek to be joined as a party to the petition) . . . .

28

42 U.S.C. § 675(5).

Because §§ 675(5)(D) and (E) are definitional in nature, they alone cannot and do not supply a basis for conferring rights enforceable under § 1983. See Gonzaga, 536 U.S. at 280, 122 S. Ct. at 2273; see also Charlie H. v. Whitman, 83 F. Supp. 2d 476, 490 (D.N.J. 2000) (§ 675(5), standing alone, does not confer a right enforceable under § 1983); B.H. v. Johnson, 715 F. Supp. 1387, 1401 (N.D. Ill. 1989) ("It would be strange for Congress to create enforceable rights in the definitional section of a statute.").

Other than the definition, the only provision in Part E of Title IV that uses the term "case review system" is 42 U.S.C. § 671(a)(16). That section conditions receipt of federal funds on the existence of a state plan that, among other things, provides for "a case review system which meets the requirements described in section 675(5)(B) . . . with respect to each such child." Section 671(a)(16) does not go beyond that and explicitly require a plan to meet the requirements described in §§ 675(5)(D) and (E).

The plaintiffs contend otherwise. They argue that we should not interpret § 671(a)(16) to require compliance only with § 675(5)(B) in order for states to receive federal funds, but we think that is the most logical interpretation. The statute plainly directs that the state must have a plan that provides for a case review

29

system "which meets the requirements described in section 675(5)(B) of this title." 42 U.S.C. § 671(a)(16). It does not say that a plan's case review system must meet the requirements of §§ 675(5)(D) and (E). Moreover, in other provisions of the Adoption Act, provisions that are codified in Part B of Title IV, Congress has required compliance with all of § 675(5) in order for a state to receive funds.[8] The conclusion we reach is that Congress knew how to require compliance with all aspects of a case review system, as described in § 675(5), when it wanted to do so. It did not choose to do so in § 671(a)(16).

Additionally, §§ 675(5)(D) and (E) do not have the kind of focused-on-the-individual, rights-creating language required by <u>Gonzaga</u>. Instead, the language of

---

[8] Part B creates a joint federal-state program that provides federal funds for child welfare services. In order to be eligible for these funds, 42 U.S.C. § 622(b)(10)(B)(ii) requires that each state have a plan for child welfare services that "provide[s] assurances that the State – is operating, to the satisfaction of the Secretary – a case review system (as defined in section 675(5) of this title) for each child receiving foster care under the supervision of the State." Another provision, 42 U.S.C. § 626(b)(3), requires that, in order for states to receive funds for projects for the development of alternate care arrangement for infants who do not need to be in hospital settings, the state develop "a case review system of the type described in § 675(5) of this title" for each infant.

The plaintiffs have not sued under either 42 U.S.C. § 622(b)(10)(B)(ii) or § 626(b)(3), which are in Part B, and instead have repeatedly said that their claims arise under Part E. Section 671(a)(16) is the only section in Part E that refers to a "case review system." So, we have confined our consideration to it. However, other courts have found that § 622(b)(10)(B)(ii), at least, does not confer an enforceable right. See <u>Charlie H. v. Whitman</u>, 83 F. Supp. 2d 476, 485-89 (D.N.J. 2000) (§ 622(b)(10)(B)(ii) is not so unambiguous as to confer a right enforceable under § 1983); <u>Eric L. v. Bird</u>, 848 F. Supp. 303, 312 (D.N.H. 1994) (plaintiffs have no enforceable right to compel state's implementation of programs under predecessor to § 622(b)(10)(B)(ii)).

those provisions gives them an aggregate or system wide focus instead of one that indicates concern with whether the needs of any particular child are met. Gonzaga, 536 U.S. 288, 122 S. Ct. at 2277-78. Although the text of the provisions speaks to "a child's health and education record" provided at "each placement of the child" and to termination of the parental rights of "the child's parents," the case review system as a whole is defined as "a procedure for assuring" that the desired steps are taken. 42 U.S.C. § 675(5). The references to individual children and their placements are made in the context of describing what the procedure is supposed to ensure, and such provisions "cannot make out the requisite congressional intent to confer individual rights enforceable by § 1983." Gonzaga, 536 U.S. at 289, 122 S. Ct. at 2278.

Further, Congress has required the Secretary of Health and Human Services to promulgate regulations for the review of the child welfare and adoption assistance programs set out in Parts B and E in order "to determine whether such programs are in substantial conformity with – State plan requirements under such parts B and E." 42 U.S.C. § 1320a-2a(a)(1) (emphasis added). The substantial conformity requirement is similar to FERPA's, which the Court in Gonzaga concluded showed an aggregate instead of an individual focus. 536 U.S. at 288, 122 S. Ct. at 2278; see also Blessing, 520 U.S. at 335, 343, 117 S. Ct. at 1357,

31

1361 (holding that Title IV-D of the Social Security Act did not support a right enforceable pursuant to § 1983, in part because the statute mandated "substantial compliance" with federal regulations).

As for enforcement of §§ 675(5)(D) and (E), it is true that the statutes do not contain "a remedial scheme sufficiently comprehensive to demonstrate congressional intent to preclude the remedy of suits under § 1983." Blessing, 520 U.S. at 346, 117 S. Ct. at 1362 (internal marks omitted). In fact, the Adoption Act contains no mechanism by which aggrieved individuals can enforce its provisions. Instead, the Secretary enforces the Adoption Act by requiring the implementation of corrective action or withholding federal funds if the states fail to comply with an approved plan. See 42 U.S.C. § 1320a-2a. Federal regulations require that the Secretary audit states to determine whether they are in compliance. 45 C.F.R. §§ 1355.32-33; 1355.36. This enforcement scheme is not like those that have been held by the Supreme Court to preclude suits under § 1983. See Gonzaga, 536 U.S. at 289-90, 122 S. Ct. at 2278-79 (creation of centralized review board for individual complaints and enforcement of FERPA precluded private suits); Smith v. Robinson, 468 U.S. 992, 1010-12, 104 S. Ct. 3457, 3467-68 (1984), superseded in part by 20 U.S.C. § 1415 (review scheme in Education of the Handicapped Act permitting aggrieved individuals to invoke "carefully tailored" local administrative

32

procedures followed by federal judicial review precluded § 1983 suits because such suits would "render superfluous most of the detailed procedural protections outlined in the statute"); Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n, 453 U.S. 1, 13, 20, 101 S. Ct. 2615, 2623, 2626-27 (1981) ("unusually elaborate enforcement provisions" of the Federal Water Pollution Control Act, which provided many enforcement options, including noncompliance orders, civil suits, and criminal penalties and authorized private persons to initiate enforcement actions, foreclosed § 1983 suit). Nonetheless, in this case, the lack of an enforcement mechanism by which an aggrieved individual can obtain review is but one of the factors we consider. The others point in the other direction and prevent us from saying that Congress spoke with a clear voice to unambiguously manifest its intent to create enforceable rights.

One other, more specific argument of the plaintiffs needs to be discussed. They contend that § 103(c) of the Adoption and Safe Families Act of 1997 (ASFA), Pub. L. No. 105-89, 111 Stat. 2115, 2119, shows that Congress intended that the right to have parental rights termination proceedings initiated within the statutory period be an enforceable right for children in foster care. Section 103(c) provides:

(1) NEW FOSTER CHILDREN.– In the case of a child who enters foster care . . . under the responsibility of a State after the date of the enactment of this Act–

(A) if the State comes into compliance with the amendments made by [section 103(a), which amended the Adoption Act] before the child has been in such foster care for 15 of the most recent 22 months, the State shall comply with [42 U.S.C. § 675(5)(E)] with respect to the child when the child has been in such foster care for 15 of the most recent 22 months; and

(B) if the State comes into such compliance after the child has been in such foster care for 15 of the most recent 22 months, the State shall comply with [42 U.S.C. § 675(5)(E)] with respect to the child not later than 3 months after the end of the first regular session of the State legislature that begins after such date of enactment.

(2) CURRENT FOSTER CHILDREN.– In the case of children in foster care under the responsibility of the State on the date of the enactment of this Act, the State shall–

\*\*\*

    (C) not later than 18 months after the end of such first regular [legislative] session, comply with [42 U.S.C. § 675(5)(E)] with respect to all of such children.

ASFA § 103(c). Section 103(c) does mandate that a state must comply with 42 U.S.C. § 675(5)(E) with respect to all children in foster care.

However, when examined in light of the structure of both that section of the ASFA and the Adoption Act as a whole, § 103(c) is ambiguous. Section 103(c)(4) provides that the requirements of § 103(c) "shall be treated as State plan requirements imposed by [42 U.S.C. § 671(a)]." Treating § 103(c) as a plan requirement means that the Secretary is to review compliance with the requirements of § 103(c) only for substantial compliance, not for compliance in every individual case. See 42 U.S.C. § 1320a-2a(a)(1) (requiring Secretary to

35

"promulgate regulations for the review of such programs [under Parts B and E of Title IV] to determine whether such programs are in <u>substantial conformity</u> with – State plan requirements under such parts B and E.") (emphasis added). The substantial conformity standard applicable to § 103(c) of the ASFA puts that provision on the same footing as 42 U.S.C. §§ 675(5)(D) and (E), and it prevents us from finding that the statute manifests an unambiguous congressional intent to create a right enforceable under § 1983.

Taken as a whole, §§ 675(5)(D) and (E) do not contain rights-creating language; they have an aggregate, not individual, focus. Those provisions do not give plaintiffs an "unambiguously conferred right to support a cause of action brought under § 1983." <u>Gonzaga</u>, 536 U.S. at 283, 122 S. Ct. at 2275. Congress has not spoken with a clear voice manifesting an unambiguous intent for those provisions of the Adoption Act to provide a basis for private enforcement. <u>Id.</u> at 280, 122 S. Ct. at 2273; <u>Pennhurst</u>, 451 U.S. at 17, 28 & n.21, 101 S. Ct. at 1540, 1545 & n.21. Count IV of the complaint, therefore, does not state a claim upon which relief can be granted.

## IV. <u>YOUNGER</u> ABSTENTION

Because some of the plaintiffs have standing to pursue the constitutional claims, we turn to the issue arising from the district court's dismissal of Counts I

36

through III under the abstention doctrine of <u>Younger v. Harris</u>, 401 U.S. 37, 91 S.

Ct. 746 (1971). We review an abstention decision only for an abuse of discretion.

<u>Boyes v. Shell Oil Prods. Co.</u>, 199 F.3d 1260, 1265 (11th Cir. 2000).

The Supreme Court has said that federal courts have a "virtually unflagging

obligation . . . to exercise the jurisdiction given them." <u>Col. River Water</u>

<u>Conservation Dist. v. United States</u>, 424 U.S. 800, 817, 96 S. Ct. 1236, 1246

(1976). But "virtually" is not "absolutely," and in exceptional cases federal courts

may and should withhold equitable relief to avoid interference with state

proceedings. <u>New Orleans Pub. Serv., Inc. v. Council of New Orleans</u>, 491 U.S.

350, 359, 109 S. Ct. 2506, 2513 (1989). While non-abstention remains the rule, the

<u>Younger</u> exception is an important one. It derives from "the vital consideration of

comity between the state and national governments," <u>Luckey v. Miller</u>, 976 F.2d

673, 676 (11th Cir. 1992) ("<u>Luckey V</u>"),[9] which <u>Younger</u> itself characterized as a

"sensitivity to the legitimate interests of both State and National Governments,"

401 U.S. at 44, 91 S. Ct. at 750.

---

[9]The genealogy of the <u>Luckey</u> case is: <u>Luckey v. Harris</u>, 860 F.2d 1012 (11th Cir. 1988) ("<u>Luckey I</u>"); <u>Luckey v. Harris</u>, 896 F.2d 479 (11th Cir. 1989) ("<u>Luckey II</u>"); <u>Harris v. Luckey</u>, 918 F.2d 888 (11th Cir. 1990) ("<u>Luckey III</u>"); <u>Luckey v. Miller</u>, 929 F.2d 618 (11th Cir. 1991) ("<u>Luckey IV</u>"); and <u>Luckey v. Miller</u>, 976 F.2d 673 (11th Cir. 1992) ("<u>Luckey V</u>").

Although Younger concerned state criminal proceedings, its principles are "fully applicable to noncriminal judicial proceedings when important state interests are involved." Middlesex County Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423, 432, 102 S. Ct. 2515, 2521 (1982). "Proceedings necessary for the vindication of important state policies or for the functioning of the state judicial system . . . evidence the state's substantial interest in the litigation." Id. "Where vital state interests are involved, a federal court should abstain unless state law clearly bars the interposition of the constitutional claims." Id. (citation omitted). As the Middlesex Court framed the issue, "The question . . . is threefold: first, do [the proceedings] constitute an ongoing state judicial proceeding; second, do the proceedings implicate important state interests; and third, is there an adequate opportunity in the state proceedings to raise constitutional challenges." Id. (emphasis omitted); see also Old Republic Union Ins. Co. v. Tillis Trucking Co., 124 F.3d 1258, 1261 (11th Cir. 1997).

The parties agree, and so do we, that the continuing state dependency proceedings involving each of the plaintiffs are ongoing state proceedings for the purposes of Middlesex analysis, see J.B. ex rel. Hart v. Valdez, 186 F.3d 1280, 1291 (10th Cir. 1999) (holding that continuing jurisdiction of juvenile court and six month periodic review hearings constituted an ongoing state judicial proceeding),

38

although they dispute whether this federal proceeding, if allowed to go forward, would interfere with those state proceedings. The parties also agree, and so do we, that important state interests are involved. The parties disagree about whether the state court dependency proceedings provide the plaintiffs with an opportunity to raise and vindicate the federal constitutional claims, if those claims are valid. We will start by addressing whether the first Middlesex factor is properly read as requiring federal court interference with state proceedings and whether a federal court proceeding in this case would interfere with the dependency proceedings. Then we will address whether the plaintiffs have an adequate state remedy.

## A. THE FIRST MIDDLESEX FACTOR

Both the plaintiffs and the defendants have presumed the first Middlesex factor, in addition to requiring an ongoing state proceeding, also requires that the federal relief the plaintiffs seek would interfere with those proceedings, and that if it would not interfere with the state proceedings, then the federal court has no basis for abstaining under Younger. See generally, Middlesex, 457 U.S. at 431, 102 S. Ct. at 2521 ("Younger v. Harris . . . and its progeny espouse a strong federal policy against federal-court interference with pending state judicial proceedings absent extraordinary circumstances."). Decisions from some other circuits support that view. See, e.g., Green v. City of Tucson, 255 F.3d 1086, 1097 (9th Cir. 2001) (en

banc) ("[T]he three part test we derived from <u>Middlesex</u> is a suitable guide for analysis only when the threshold condition for <u>Younger</u> abstention is present – that is, when the relief sought in federal court would in some manner directly 'interfere' with ongoing state judicial proceedings."); <u>J.B.</u>, 186 F.3d at 1291 (stating first <u>Middlesex</u> factor as requiring abstention under <u>Younger</u> "when federal proceedings would . . . interfere with an ongoing state judicial proceeding"); <u>FOCUS v. Allegheny County Court of Common Pleas</u>, 75 F.3d 834, 843 (3d Cir. 1996) (stating first <u>Middlesex</u> factor as "there must be an ongoing state judicial proceeding to which the federal plaintiff is a party and with which the federal proceeding will interfere").

We have not yet expressly held that the first <u>Middlesex</u> factor requires that the federal proceeding interfere with the state proceeding, but implicitly we seem to have assumed as much. For example, in <u>Old Republic</u>, the plaintiff filed a declaratory judgment action in federal court to avoid paying a state court judgment and to have its obligations under certain insurance policies determined by a federal court instead of a state court. 124 F.3d at 1259. In applying the <u>Middlesex</u> factors, we concluded that the first factor was met, not simply because there was an ongoing state proceeding, but because that proceeding would have been effectively enjoined by a declaratory judgment issued by the federal court. <u>Id.</u> at 1261-62; <u>see</u>

40

also For Your Eyes Alone, Inc. v. City of Columbus, 281 F.3d 1209, 1216 n.13 (11th Cir. 2002) ("[T]he Supreme Court has held that Younger abstention is sometimes applicable to restrain federal court interference with certain noncriminal state proceedings that implicate important state interests."). Indeed, the Supreme Court in Middlesex held that "[b]ecause respondent . . . had an opportunity to raise and have timely decided by a competent state tribunal the federal issues involved . . . federal courts should abstain from interfering with the ongoing proceedings." 457 U.S. at 437, 102 S. Ct. at 2524 (emphasis added) (citation and internal quotation marks omitted). Therefore, we join our sister circuits in explicitly stating that an essential part of the first Middlesex factor in Younger abstention analysis is whether the federal proceeding will interfere with an ongoing state court proceeding. If there is no interference, then abstention is not required.

In order to decide whether the federal proceeding would interfere with the state proceeding, we look to the relief requested and the effect it would have on the state proceedings. See O'Shea v. Littleton, 414 U.S. 488, 499-502, 94 S. Ct. 669, 677-79 (1974); Luckey V, 976 F.2d at 679 (Younger and O'Shea require "focus on the likely result of an attempt to enforce an order of the nature sought here"). The relief sought need not directly interfere with an ongoing proceeding or terminate an ongoing proceeding in order for Younger abstention to be required. In O'Shea, the

41

Supreme Court held that abstention was required where an injunction would have "indirectly accomplish[ed] the kind of interference that Younger v. Harris . . . and related cases sought to prevent." Id. at 500, 94 S. Ct. at 678 (emphasis added). The plaintiffs in O'Shea did not seek to enjoin directly any pending prosecutions but apparently did seek a federal court injunction aimed at controlling or preventing the occurrence of specific events that might take place in the course of future state criminal trials. The requested injunction contemplated interruption of the state proceedings in order for the federal court to adjudicate compliance by the defendants with the injunction, through what the Supreme Court called "an ongoing federal audit of state criminal proceedings." Id. at 500, 94 S. Ct. at 678. The Court found that the injunction "would disrupt the normal course of proceedings in the state courts via resort to the federal suit for determination of the claim ab initio." Id. at 501, 94 S. Ct. at 679.

We applied the reasoning of O'Shea in Luckey V. 976 F.2d at 678-79. In that case, the plaintiffs had asserted a class action on behalf of "all individuals who are or will in the future be adversely affected by the unconstitutional practices of the indigent defense system within Georgia." Id. at 676. They sought injunctive relief to reform the indigent defense system, including orders that the system provide speedy appointment of counsel and ensure that there would be counsel at

42

all probable cause determinations, and would have required monitoring the implementation of the injunction. Id. Adopting in full the explanation in the district court's abstention order, we concluded that the decree requested by the plaintiffs inevitably would interfere with state criminal proceedings. Id. at 677.

Luckey V did not involve a direct termination of ongoing state proceedings, and the plaintiffs did not directly contest any single criminal conviction or seek to restrain any individual prosecution. Nevertheless, as we observed, the injunctive relief the plaintiffs sought would have had the effect of restraining every indigent prosecution until the systemic improvements they wanted were in place. Id. We focused on the effect of the requested relief on the state proceedings. See id.; see also Joseph A. ex rel. Wolfe v. Ingram, 275 F.3d 1253, 1272 (10th Cir. 2002) ("Younger governs whenever the requested relief would interfere with the state court's ability to conduct proceedings, regardless of whether the relief targets the conduct of a proceeding directly.") (citing News-Journal Corp. v. Foxman, 939 F.2d 1499, 1511 (11th Cir. 1991) (affirming district court's decision to abstain under Younger from hearing newspaper's challenge to state court's pre-trial order because an injunction would restrict the ability of the state court to impanel an impartial jury)).

Whether the effect of the federal court injunctive relief the plaintiffs seek in this lawsuit will interfere with ongoing state dependency proceedings depends in part upon the nature and extent of those proceedings. The state trial level courts of Florida play a critically important role in dependency hearings from the outset of a child's case. After the Department files a petition for dependency, the court holds an adjudicatory hearing as soon as practicable. Fla. Stat. § 39.507. If the facts alleged in the dependency petition are proven in the adjudicatory hearing and the child is determined to be dependent, the state court conducts a disposition hearing. Id. §§ 39.507(7); 39.521(1). The Department must prepare a written case plan and a predisposition study and file these items with the court no later than 72 hours before the disposition hearing. Id. § 39.521(1)(a).

The case plan is a document that "follows the child from the provision of voluntary services through any dependency, foster care, or termination of parental rights proceeding or related activity or process." Id. § 39.01(11). It must include, among other items, a description of the permanency goal for the child, a description of the type of home or institution in which the child is to be placed, a discussion of the safety and appropriateness of the child's placement, the services that the child needs and will receive, a description of the visitation rights of the parents, and a

44

description of the efforts to be undertaken to maintain the stability of the child's education.  Id. § 39.601(3)(a)-(i).

The case plan must be approved by the court.  Id. §§ 39.601(2), (3); 39.603. It may be amended if all the parties agree and the court approves, or after a hearing it may be amended by the court on its own motion or that of a party, based on competent evidence that demonstrates the need for an amendment.  Id. § 39.601(9)(f).  If at the hearing on the case plan, which occurs in conjunction with the disposition hearing, the court determines that any of the elements required in the plan are not present, it can order the Department to amend the plan to include what is necessary.  Id. § 39.603(2).

The state court has continuing jurisdiction over a dependency case and reviews the child's status at least every six months.  Id. § 39.701(1)(a).  Prior to the review hearing, the Department must furnish to the court a written report that includes, among other items, a description of the placement of the child, its appropriateness, the safety of the child, the number of placements, documentation of the efforts of all parties to comply with the case plan, the number of times the child's educational placement has been changed, and copies of all medical and psychological records that support the terms of the case plan.  Id. § 39.701(6)(a). At the review hearing, the court considers the child's situation, including whether

there has been compliance with the case plan, the appropriateness of the child's current placement, and whether the child is in a setting that is family-like and consistent with the child's best interests and special needs. Id. § 39.701(7)(d), (g). No later than 12 months after the date that the child is placed in shelter care, the court must conduct a judicial review to plan for the child's permanent placement. Id. § 39.701(8)(f). If the child is not returned to his parents, the case plan must document steps the Department is taking to find an adoptive parent or other permanent living arrangement for the child. Id.

If the Department has not complied with the case plan, the court may find it in contempt. Id. § 39.701(8)(c). The court can also issue protective orders. Id. § 39.701(8)(g). A protective order can require a person or agency to make periodic reports to the court containing such information as the court prescribes. Id. The court can issue a protective order in support of, or as a condition to, any other order it may make. Id.

The Tenth Circuit has addressed two cases similar to this one and held that abstention was required because the plaintiffs' federal proceeding would interfere with the state court proceedings by "fundamentally changing the dispositions and oversight of the children." J.B., 186 F.3d at 1291-92; see also Joseph A., 275 F.3d 1253. In J.B., the plaintiffs, mentally or developmentally disabled children in the

46

custody of New Mexico, alleged violations of the Constitution and federal statutes and brought suit against several state officers in their official capacities, seeking declaratory and injunctive relief. The Tenth Circuit concluded that the relief requested would give the federal district court an oversight role over the entire state program for children with disabilities and would give it control over decisions then in the hands of the New Mexico Children's Court, such as whether to return a child to his parents or whether to modify a treatment plan. J.B., 186 F.3d at 1292.

In the other similar case decided by the Tenth Circuit, Joseph A., the plaintiffs, who were children in New Mexico's custody because of abuse or neglect, and the New Mexico Department of Human Services had entered into a federal court consent decree. 275 F.3d at 1259. When the plaintiff children moved the court to hold the Department in contempt for allegedly violating the consent decree, the Department moved for dismissal based on Younger abstention. The Tenth Circuit held that federal court enforcement of certain provisions of the decree would interfere with the ongoing juvenile proceedings in the state court.[10] Id. at 1272. It concluded that "federal court oversight of state court operations,

---

[10]Some of the provisions that the Tenth Circuit cited as "[p]articularly problematic" under Younger included provisions governing assessment and treatment planning conferences for children entering the Department of Human Services' custody and periodic review of the Department's plans for those children. Joseph A., 275 F.3d at 1267-68.

47

even if not framed as direct review of state court judgments, may nevertheless be problematic for Younger purposes," citing O'Shea and Luckey V. Id. at 1271.

In this case, the plaintiffs are seeking relief that would interfere with the ongoing state dependency proceedings by placing decisions that are now in the hands of the state courts under the direction of the federal district court. The declaratory judgment and injunction that they request would interfere with the state proceedings in numerous ways. The federal and state courts could well differ, issuing conflicting orders about what is best for a particular plaintiff, such as whether a particular placement is safe or appropriate or whether sufficient efforts are being made to find an adoptive family. The federal court relief might effectively require an amendment to a child's case plan that the state court would not have approved, and state law gives its courts the responsibility for deciding upon such an amendment. See Fla. Stat. § 39.601(9)(f). Even though any remedial order would run against the Department, state law makes it a duty of state courts to decide whether to approve a case plan, and to monitor the plan to ensure it is followed. Id. § 39.701(1), (7)-(8). The plaintiffs seek to have the district court appoint a panel and give it authority to implement a systemwide plan to revamp and reform dependency proceedings in Florida, as well as the appointment of a permanent children's advocate to oversee that plan. To say the least, taking the

responsibility for a state's child dependency proceedings away from state courts and putting it under federal court control constitutes "federal court oversight of state court operations, even if not framed as direct review of state court judgments" that is problematic, calling for <u>Younger</u> abstention. <u>Joseph A.</u>, 275 F.3d at 1271. The relief that the plaintiffs seek would interfere extensively with the ongoing state proceedings for each plaintiff.[11] The first <u>Middlesex</u> factor is satisfied.

## B. THE THIRD <u>MIDDLESEX</u> FACTOR

As for the other <u>Middlesex</u> factor that is disputed, the third one, the plaintiffs have the burden of establishing that the state proceedings do not provide an adequate remedy for their federal claims. <u>Butler v. Ala. Judicial Inquiry Comm'n</u>, 261 F.3d 1154, 1159 (11th Cir. 2001). "Minimal respect for the state processes, of course, precludes any <u>presumption</u> that the state courts will not safeguard federal constitutional rights." <u>Middlesex</u>, 457 U.S. at 431, 102 S. Ct. at 2521. A federal

---

[11]The plaintiffs argue that the requested relief would not interfere because it is directed solely at the Department of Children and Families and not the state courts. We previously rejected essentially that same argument in <u>Luckey V</u>, and we reject it again here. In that case, the plaintiffs sued the Governor of Georgia and all state court judges who presided over prosecutions of indigent defendants. 976 F.3d 673, 678. The plaintiffs contended that the relief they requested against the Governor of Georgia would not interfere with state court proceedings because the onus to comply would be on the state executive and not the judiciary. <u>Id.</u> We observed that "a case cannot be decided in a vacuum, and the potential enforcement difficulties of any order reforming such an integral aspect of a state criminal justice process as the indigent defense system would be significant." <u>Id.</u> at 679. This case raises the same concerns that <u>Luckey V</u> did, and the federal court relief the plaintiffs seek would interfere with the ongoing state dependency hearings, even if it were directed against the Department and state officers, instead of state courts and judges.

49

court "should assume that state procedures will afford an adequate remedy, in the absence of unambiguous authority to the contrary." Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 15, 107 S. Ct. 1519, 1528 (1987). Plaintiffs, having failed to raise their federal claims in the ongoing state proceedings involving them, must overcome this initial presumption by demonstrating that the state remedies are inadequate. Butler, 261 F.3d at 1159.

In determining whether the state remedies are adequate, as the district court correctly observed, "[t]he relevant question is not whether the state courts can do all that Plaintiffs wish they could, but whether the available remedies are sufficient to meet Pennzoil's requirement that the remedy be adequate." The district court found that "the juvenile court can act to protect children within its jurisdiction," citing Dep't of Children & Family Servs. v. I.C., 742 So. 2d 401, 404 (Fla. 4th DCA 1999), and declined to hold that the remedies available are inadequate. We agree with its conclusion.

A Florida state court can remedy in a dependency proceeding the harms that a child in the defendants' custody and in that court's jurisdiction might suffer. Although the Department has discretion regarding the identification of a specific placement for a child, State v. Brooke, 573 So. 2d 363, 368 (Fla. 1st DCA 1991), the court can order that siblings be placed together in foster care, one of the very

50

things that some of these plaintiffs seek. See Div. of Family Servs. v. S.R., 328 So. 2d 270, 271 (Fla. 1st DCA 1976); F.B. v. State, 319 So. 2d 77, 79 (Fla. 1st DCA 1975). The court can order that a child be placed in a therapeutic setting, In the Interest of L.W., 615 So. 2d 834, 839 (Fla. 4th DCA 1993), and that a child be treated by a licensed health care professional or receive mental health treatment. Fla. Stat. § 39.407(4). While the state court cannot compel the Department to place children where space is not available, Dep't of Children & Family Servs. v. M.H., 830 So. 2d 849, 850 (Fla. 2d DCA 2002), it can hold the Department in contempt for failing to comply with a child's case plan and can order the Department to submit proposals for compliance. Fla. Stat. § 39.701(8)(c); L.W., 615 So. 2d at 837-38. Even though the court cannot prevent the Department from using unsafe or inappropriate facilities for all children, as to those children within its division, the court can take protective measures. It can determine whether a facility in which a child is located is safe, either by appointing a child's representative to make an inquiry or itself investigating conditions at the facility. Fla. Stat. § 39.701(8)(g); I.C., 742 So. 2d at 405. If the investigation reveals that a child within the jurisdiction of the court (meaning within its division) is in a dangerous facility, the court can take action, including finding the Department in contempt for failing to comply with the child's case plan. See generally, Fla. Stat. §§ 39.601(3)(e);

51

39.701(8)(c); I.C., 742 So.2d at 404-06. Case plans always call for an appropriate placement, and an unsafe facility is not an appropriate one. Fla. Stat. § 39.601(3)(e) ("placement is intended to be safe, the least restrictive and most family-like setting available consistent with the best interest and special needs of the child, and in as close proximity as possible to the child's home").

Again, the Tenth Circuit's decisions in similar cases are helpful. In J.B., that Court affirmed the district court's decision to abstain, because the plaintiffs had failed to show clearly that they could not have raised their claims in their periodic review hearings in the New Mexico Children's Court. 186 F.3d at 1292. The Court concluded that New Mexico law "seemingly grants the Children's Court wide power to determine the needs and claims of children during the periodic review proceeding." Id. Additionally, because the Children's Court was a court of general jurisdiction and had full constitutional powers under New Mexico law, the plaintiffs had not provided the "unambiguous authority" that Pennzoil requires to prove that the state courts could not afford an adequate remedy. Id. at 1292-93.

In Joseph A., the Tenth Circuit held that a certified class of plaintiffs had not shown that the New Mexico Children's Court offered inadequate opportunities to raise federal constitutional and statutory claims. 275 F.3d at 1274. The plaintiffs in that case argued that the systemwide, structural relief they sought was not available

52

in the Children's Court and cited a New Mexico decision, In re T.B., 913 P.2d 272 (N.M. App. 1996), for that proposition. The Tenth Circuit was not convinced the T.B. decision established the Children's Court was precluded from granting systemic relief. 275 F.3d at 1274 n.6. Although in T.B. the Children's Court had dismissed a motion brought under § 1983 to require the Department of Human Services "to submit an action plan for a system for the proper licensure and regulation of therapeutic foster care," the New Mexico Court of Appeals had addressed the dismissal only in dicta, noting that the guardian ad litem who had filed the motion had failed to identify which federal laws secured the rights the plaintiffs sought to enforce. Id. The Court held that the plaintiffs had not provided unambiguous authority that the relief they sought was unavailable. Id. at 1274.

In the present case, each of these plaintiffs is represented by counsel. There are no procedural constraints preventing them from presenting the claims in this case to the state courts in their dependency review hearings. They have not provided unambiguous authority establishing that the procedures available in state court dependency proceedings do not provide an adequate opportunity for them to raise their constitutional claims. At dependency review proceedings for each plaintiff in this case, the state court will consider whether the parties have complied with the child's case plan, the appropriateness of that child's current facility

53

placement, educational placement, and any special needs the child has. Fla. Stat. §§ 39.701(7)(d), (g). If the Department is not complying with the case plan for the child, the court can hold it in contempt. Id. §§ 39.701(8)(c), (g). If the plaintiff claims that he is in an unsafe and inappropriate placement, as we have already noted, the court can order the Department to comply with the case plan by putting him in a safe and appropriate place. Id. §§ 39.601(3)(e); 39.701(8)(c). If the plaintiff claims that he has been in foster care longer than reasonably necessary, the court can require the Department to document the steps that it is taking toward permanent placement. Id. § 39.701(f). If the plaintiff has not been placed with his siblings, the court can order them be placed together or it can require visitation between them. See Div. of Family Servs. v. S.R., 328 So. 2d 270, 271 (Fla. 1st DCA 1976).

The availability of these forms of relief and the existence of the state courts' protective order and contempt powers mean that the plaintiffs have not carried their burden of establishing that the ongoing state court proceedings do not provide an adequate opportunity to raise and vindicate each plaintiff child's individual

claims.[12]  Therefore, the third and final <u>Middlesex</u> factor is satisfied.  The district

court did not abuse its discretion in abstaining under the <u>Younger</u> doctrine.

---

[12]In <u>LaShawn A. ex rel. Moore v. Kelly</u>, 990 F.2d 1319, 1323-24 (D.C. Cir. 1993), the Court held that the District of Columbia's juvenile review proceedings did not provide the plaintiffs an adequate opportunity to raise their constitutional challenges.  The plaintiffs in that case brought a class action on behalf of children who were in foster care under the supervision of the District of Columbia Department of Human Services, alleging widespread federal constitutional and statutory violations.  The D.C. Circuit affirmed the district court's decision that <u>Younger</u> abstention was not warranted after noting that the state court had "explicitly rejected the use of review hearings to adjudge claims requesting broad-based injunctive relief based on federal law" in <u>In re Brim</u>, No. 489-80 (D.C. Super. Ct. July 20, 1984).  In the <u>Brim</u> case the family court had denied a motion by two children for injunctive relief against the Department for its alleged mishandling of Social Security disability payments it had collected on the children's behalf and noted that the appropriate forum for such issues is federal court. <u>LaShawn A.</u>, 990 F.2d at 1323.  The D.C. Circuit therefore rejected <u>Younger</u> abstention because "there was no pending judicial proceeding in the District of Columbia which could have served as an adequate forum for the class of children in this case to present its multifaceted request for broad-based injunctive relief based on the Constitution and on federal and local statutory law." <u>Id.</u>

In contrast to the D.C. Circuit, however, in this circuit's <u>Younger</u> decisions, we have not determined whether the broad relief the plaintiffs would prefer is available but instead whether the forum itself is adequate for addressing the claims and providing a sufficient remedy to the individual plaintiffs.  In the <u>Luckey</u> case, the plaintiffs sought broad-based injunctive relief to reform Georgia's indigent defense system.  <u>Luckey V</u>, 976 F.2d at 676.  Although we did not expressly address the third <u>Middlesex</u> factor in our opinion in that case, we did affirm the district court's decision to abstain under <u>Younger</u>.  <u>Id.</u> at 679.  The decision turned on the fact that the <u>Luckey</u> plaintiffs could have brought their challenges in their individual criminal trials, even though it is obvious that the broad-sweeping remedy they sought was unavailable there.  "Equity need not intervene immediately in plaintiffs' state trials.  Plaintiffs have an adequate remedy <u>at law</u> for any ineffective assistance of counsel they may actually receive.  Most important, they can present objections to sixth amendment violations at their state trials and in their state appeals." <u>Luckey v. Harris</u>, 896 F.2d 479, 482 (11th Cir. 1989) ("<u>Luckey II</u>") (Edmondson, J., dissenting).

## V. CONCLUSION

Insofar as it relates to Larissa C. and Leanne G., the district court's judgment is VACATED and the case is REMANDED with instructions to dismiss that part of the amended complaint as moot. Insofar as it relates to Tanya M. and Elaine R., the district court's judgment is VACATED and the case is REMANDED with instructions to dismiss that part of the amended complaint for lack of standing. The district court's judgment is also VACATED as to those portions of the complaint for which the each of the seven remaining plaintiffs do not have standing, as discussed in Part II, and the case is REMANDED with instructions to dismiss those portions of the amended complaint for lack of standing. In all other respects, the district court's judgment is AFFIRMED.