[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-15078

_____

**FILED**

**U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
February 13, 2006
THOMAS K. KAHN
CLERK**

D. C. Docket No. 01-00923-CV-C-N

KIMBERLY ARRINGTON,
TAMMY CHAPMAN, et al.,

Plaintiffs-Appellants,

RHONDA WARREN,
JAMIE CODD,

Intervenors-Appellants,

versus

RANDY HELMS, Director, Administrative
Office of Courts, in his official capacity,
PAGE WALLEY, Commissioner of the Alabama
Department of Human Resources, in his
official capacity,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

**(February 13, 2006)**

Before ANDERSON, BLACK and CARNES, Circuit Judges.

BLACK, Circuit Judge:

Custodial parents who receive child support payments collected, distributed, and disbursed by the State of Alabama appeal the district court's grant of summary judgment in favor of Page Walley, in his official capacity as Commissioner of the Alabama Department of Human Resources (DHR), and Randy Helms, in his official capacity as Director of the Alabama Administrative Office of Courts (AOC).[1]  Appellants argue the district court erred in holding they failed as a matter of law (1) to establish 42 U.S.C. § 657 creates individual rights, enforceable under § 1983, to distribution of child support payments in strict compliance with § 657; and (2) to show a § 1983 violation of their procedural due process rights under the standard articulated in *Grayden v. Rhodes*, 345 F.3d 1225 (11th Cir. 2003).  We affirm.

## I.  BACKGROUND

A.    *Overview of PRWORA and Title IV-D*

This appeal involves an interlocking set of cooperative federal-state welfare and child support programs.  Seeking to standardize the states' systems for welfare and child support payments, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) under its spending

---

[1] For simplicity's sake, we will refer to Walley as "DHR" and Helms as "AOC."

power. Among other sweeping changes, PRWORA abolished Aid to Families with Dependent Children (AFDC), the federally-controlled entitlement program that had long provided cash assistance to underprivileged families. In AFDC's place, PRWORA established Temporary Assistance to Needy Families (TANF) block grants. Under the TANF regime, each state receives a predetermined block of TANF funding with which to administer its welfare program. *See* 42 U.S.C. § 601(a)(1).

Although PRWORA provides states significantly more discretion to design and manage their own welfare systems, TANF block grants do not come without strings. Rather, to qualify for a TANF block grant, a state's child support enforcement program must conform to the specifications of Title IV-D of the Social Security Act. *See* § 602(a)(2). Among other requirements, Title IV-D requires a participating state to receive approval of its program from the Secretary of the U.S. Department of Health and Human Services (HHS). *See* § 652(a)(1), (3). Additionally, each state's child support enforcement program must use a single state disbursement unit (SDU) to collect, distribute, and disburse payments. § 654b(a)(1).

Child support payments made to custodial parents who (1) currently receive TANF benefits or (2) previously received TANF benefits are known as "Title IV-

3

D payments." Under Title IV-A, current TANF recipients must assign their child support rights to the state. § 608(a)(3). To offset the costs of providing TANF benefits, the state may keep most of the child support payments it collects on behalf of current TANF recipients. *See* § 657(a)(1). Former TANF recipients are entitled to a portion of the payments collected, and the size of this portion varies according to the date the parent stopped receiving TANF benefits. § 657(a)(2).

Child support payments made to custodial parents who have never received TANF benefits are known as "non-Title-IV-D payments." Non-TANF custodial parents do not have to assign their child support rights to the state and are thus entitled to receive all collected child support funds. § 657(a)(3). If a state court issues an income withholding order in a non-TANF custodial parent's child support case, however, the non-custodial parent's employer must withhold a portion of the non-custodial parent's income and submit it to the SDU. §§ 666(a)(8)(B); 654b(a)(1)(B). Accordingly, in child support cases involving an income withholding order, non-TANF custodial parents' child support payments must flow through the SDU.

To oversee this complex federal-state program, Congress established the Office of Child Support Enforcement (OCSE) within the HHS. *See* § 652(a). This agency audits the states' compliance with their federally approved plans.

4

§ 652(a)(4)(c). If a state does not "substantially comply" with the requirements of Title IV-D, the Secretary of HHS may penalize the state by reducing its TANF grant by up to five percent. § 609(a)(8). The Secretary has interpreted "substantial compliance" as "(a) full compliance with requirements that services be offered statewide and that certain recipients be notified monthly of the support collected, as well as with reporting, recordkeeping, and accounting rules; (b) 90 percent compliance with case opening and case closure criteria; and (c) 75 percent compliance with most remaining program requirements." *Blessing v. Freestone*, 520 U.S. 329, 335, 117 S. Ct. 1353, 1357 (1997) (citing 45 C.F.R. § 1305.63).

B.     *DHR's and AOC's Role in Alabama's Child Support Payment System*

DHR administers Alabama's TANF and Title IV-D programs. Among its various Title-IV-D-related responsibilities, DHR oversees the operation of Alabama's SDU and collects, distributes, and disburses all Title IV-D payments. DHR also collects and distributes all non-Title-IV-D payments made pursuant to income withholding orders, and disburses a portion of these payments.

AOC's primary function is to oversee the administration of Alabama's court system. Under a contract with DHR, however, AOC also disburses all of the remaining non-Title-IV-D payments. Although Title IV-D requires states to have a single point of disbursement for all child support payments, HHS has authorized

5

DHR's pre-PRWORA practice of disbursing a portion of its non-Title-IV-D payments via AOC.

C.      *Relevant Procedural History*

On December 21, 2001, eight named plaintiffs filed a Corrected Amended Class Action Complaint for Declaratory and Injunctive Relief (Amended Complaint) against DHR and AOC, alleging widespread deficiencies in Alabama's child support payment system. Two additional plaintiffs subsequently intervened. On September 1, 2004, the district court granted summary judgment to DHR and AOC on all of the ten named plaintiffs' 12 claims for relief.[2]

Only nine of the named plaintiffs have appealed the district court's summary judgment order. Each remaining appellant falls into one of two categories. First, Appellants Kimberly Arrington, Terralisa Casby-Jackson, Carmelitess Felder, Tanya Jackson, Sharon Scott, Rhonda Warren, and Lakisha Woodall (the Arrington Appellants) currently or formerly received TANF benefits.[3] Accordingly, the child support payments they receive constitute Title

---

[2] Although the named plaintiffs sought certification of their case as a class action, the district court ruled on the summary judgment motions before it considered the class certification issue.

[3] To be precise, some of the Arrington Appellants received benefits under the AFDC program, which PRWORA abolished and replaced with TANF. For purposes of simplicity, we refer to AFDC payments as TANF payments.

IV-D payments disbursed by DHR. Second, Appellants Tammy Chapman and Jamie Codd (the Chapman Appellants) have never received TANF benefits, but their child support payments are subject to income withholding orders. The child support payments they receive constitute non-Title-IV-D payments disbursed by AOC.

On appeal, Appellants challenge the district court's grant of summary judgment to DHR and AOC on their Eleventh Claim for Relief, in which they assert § 657 provides them the right, enforceable against DHR and AOC under § 1983, to distribution of their payments in strict compliance with § 657.[4] Additionally, the Arrington Appellants[5] challenge the district court's grant of

---

[4] The Appellants' Eleventh Claim for Relief provides in relevant part: "Plaintiff custodial parents who receive [Title] IV-D services have a right under federal law to distribution of support as specified in 42 U.S.C. § 657 and 45 C.F.R. § 302.51." If the statute at issue does not create rights enforceable under 42 U.S.C. § 1983, then neither do the regulations adopted under that statute. *Harris v. James*, 127 F.3d 993, 1009 (11th Cir. 1997). As explained below, we hold § 657 does not create enforceable rights under § 1983. Thus, we need not address whether 45 C.F.R. § 302.51 creates rights enforceable under § 1983.

[5] The district court held the Chapman Appellants lacked standing to bring their procedural due process claims against AOC, and they failed to contest this holding on appeal. "The party who invokes federal jurisdiction must establish that it has standing to assert its claim." *Nat'l Alliance for the Mentally Ill, St. Johns Inc. v. Bd. of County Comm'rs*, 376 F.3d 1292, 1294 (11th Cir. 2004). In *National Alliance for the Mentally Ill*, the district court held the plaintiffs-appellants failed to establish they had standing to sue. *Id.* Although Federal Rule of Appellate Procedure 28(a)(9)(A) provides an "appellant's brief must contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies," two of the plaintiffs-appellants neglected to cite anything in the record establishing their standing. *Id.* at 1295. Accordingly, we stated:

> The Court has warned litigants that "failure to comply with Rule 28(a)(9)(A) of
> the Federal Rules of Appellate Procedure may result in waiver or abandonment of

summary judgment to DHR on their Fourth[6] and Eighth[7] Claims for Relief. Under

these two claims, they contend DHR violated their § 1983 procedural due process

>           issues on appeal." Because [the plaintiffs-appellants] have not satisfied Rule
>           28(a)(9)(A), the Court deems them to have waived any claim concerning their
>           individual standing.

*Id.* at 1296 (citation omitted).

          Similarly, the Chapman Appellants failed to satisfy Rule 28(a)(9)(A) by neither expressly
arguing they have standing nor citing a single case or record excerpt to contradict the district
court's holding. In the "Statement of the Issues" section of their brief, the Chapman Appellants
ask whether the district court erred when it held they lacked standing to sue AOC for allegedly
violating their procedural due process rights. Instead of pursuing the standing issue in the
"Argument" section, however, they merely reiterate their substantive claims. Therefore, the
Chapman Appellants violated Rule 28(a)(9)(A) with regard to establishing their standing. Under
*National Alliance for the Mentally Ill*, we thus deem waived any argument the Chapman
Appellants have concerning their standing and will not address their procedural due process
claims. *See also Transamerica Leasing, Inc. v. Inst. of London Underwriters*, 430 F.3d 1326,
1331 n.4 (11th Cir. 2005) (deeming waived an issue raised in the appellant's "Statement of the
Issues" but not argued in the text of its brief).

          [6] The Appellants' Fourth Claim for Relief provides:
>           Defendants' failure to provide Plaintiffs with accurate, timely, frequent
>           and meaningful notice of support collected and distributed violates Plaintiffs'
>           rights to procedural Due Process under the Fourteenth Amendment to the United
>           States Constitution. Defendants must provide notices and explanations which will
>           allow a parent to understand the distribution of each child support collection and
>           to identify possible errors in distribution and delays in disbursement.

          [7] The Appellants' Eighth Claim for Relief provides:
>           Defendants' failure to provide Plaintiffs with an effective and efficient
>           administrative procedure to correct errors in the distribution of child support
>           collections and the failure to notify the Plaintiffs of this procedure and how it
>           would be used, violates procedural Due Process and deprives Plaintiffs of
>           property without Due Process of Law in violation of the Fourteenth Amendment
>           to the United States Constitution.

This claim appears to contain two components: (1) DHR lacks an effective and efficient
administrative procedure to correct errors in the distribution of child support collections, and
(2) DHR fails to notify custodial parents of the administrative hearing procedure and how it
should be used. In their initial brief, however, the Arrington Appellants do not make a single
argument pertaining to the effectiveness and efficiency of DHR's hearing procedures.
Accordingly, they have waived the first component of their Eighth Claim for Relief, and we
address only the second component.

rights by failing to provide them adequate notice of (1) DHR's handling of their payments, and (2) their right to and the procedures for requesting a hearing.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, applying the same legal standards as the district court, and viewing all facts and reasonable inferences therefrom in the light most favorable to the non-moving party. *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000).

## III. ANALYSIS

### A. *Statutory Claim: 42 U.S.C. § 657*[8]

---

[8]  Section 657 provides in relevant part:
(a)  In general
         . . . . [A]n amount collected on behalf of a family as support by a State pursuant to a plan approved under this part shall be distributed as follows:
         (1)  Families receiving assistance
                In the case of a family receiving assistance from the State, the State shall—
                (A)  pay to the Federal Government the Federal share of the amount so collected; and
                (B)  retain, or distribute to the family, the State share of the amount so collected.
In no event shall the total of the amounts paid to the Federal Government and retained by the State exceed the total of the amounts that have been paid to the family as assistance by the State.
         (2)  Families that formerly received assistance
                In the case of a family that formerly received assistance from the State:
                (A)  Current support payments
                 To the extent that the amount so collected does not exceed the amount required to be paid to the family for the month in which collected, the State shall distribute the amount so collected to the family.
                (B)  Payments of arrearages

Appellants contend DHR and AOC have failed to distribute their child support payments in accordance with the requirements set forth in § 657 of Title IV-D.[9]  Seeking redress for DHR's and AOC's alleged mishandling of their payments, Appellants claim § 657 gives them a private right, enforceable under § 1983, to distribution of their payments in strict compliance with § 657.  This issue is one of first impression in our circuit.

1.  *Legal Framework for Claims that Spending Clause Legislation Creates Individual Rights Enforceable Under § 1983*

---

> To the extent the amount so collected exceeds the amount required to be paid to the family for the month in which collected, the State shall distribute the amount so collected as follows:
>
> . . . .
>
> (3) Families that never received assistance
>
> In the case of any other family, the State shall distribute the amount so collected to the family.

[9]  Specifically, in their Eleventh Claim for Relief, Appellants assert:

> Defendants' failure to apply all amounts collected to first satisfy the obligation for current support and to forward these amounts to custodial parents violates Plaintiffs' rights under federal law.
>
> Defendants' failure to apply all amounts collected after the obligation for current support has been satisfied in a month to past due support or arrears owed to a custodial parent for any period on which the custodial parent was not receiving Family Assistance and to forward these amounts to custodial parents violates Plaintiffs' rights under federal law.
>
> Defendants' taking of amounts as arrears that exceed the total amount of Family Assistance and AFDC provided to the custodial parent violates Plaintiffs' rights under federal law.
>
> Defendants' failures to accurately allocate support collected under two or more court orders violates Plaintiffs' rights under federal law.
>
> Defendants' taking of a fee from the child support payment, rather than from an additional amount above the amount required to satisfy the child and spousal support ordered and owing, violates Plaintiffs' rights under 42 U.S.C. § 657 and 45 C.F.R. § 302.51.

10

In *Maine v. Thiboutot*, the Supreme Court established that § 1983 provides a private cause of action against any person who, acting under color of state law, abridges rights created by the Constitution and laws of the United States. *See* 448 U.S. 1, 4–5, 100 S. Ct. 2502, 2504–05 (1980); *see also* 42 U.S.C. § 1983. One year later, in *Pennhurst State Sch. & Hosp. v. Halderman*, the Supreme Court clarified that Spending Clause legislation is especially unlikely to create individual rights enforceable under § 1983. *See* 451 U.S. 1, 28, 101 S. Ct. 1531, 1545 (1981). "In legislation enacted pursuant to the spending power," the Supreme Court reasoned, "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Id.*

We have previously rejected the assertion that Title IV-D, as an undifferentiated whole, creates rights enforceable under § 1983. In *Wehunt v. Ledbetter*, a group of plaintiffs claimed they possessed an individually enforceable right to have the State of Georgia strictly comply with Title IV-D. *See* 875 F.2d 1558, 1562 (11th Cir. 1989). These plaintiffs did not ground their claim in a specific provision of Title IV-D; rather, they claimed Title IV-D generally established privately enforceable rights. *See id.* We held Title IV-D, in its entirety, does not create individual rights enforceable under § 1983, because

11

Congress enacted it "to immediately lower the cost to the taxpayer as well as to lessen the number of families enrolling in welfare in the future—benefits to society as a whole rather than specific individuals." *Id.* at 1565.

After a circuit split developed over the issue presented in *Wehunt*, the Supreme Court settled the matter in *Blessing v. Freestone*, 520 U.S. 329, 117 S. Ct. 1353 (1997). The *Blessing* plaintiffs claimed they had an enforceable individual right to have the State of Arizona's child support program achieve "substantial compliance" with Title IV-D's requirements. *Id.* at 332–33, 117 S. Ct. at 1356. Without distinguishing among Title IV-D's various provisions, the Ninth Circuit held the plaintiffs had such a right. *Id.* at 339, 117 S. Ct. at 1358–59. The Supreme Court reversed the Ninth Circuit, holding Title IV-D's "substantial compliance" requirement "was not intended to benefit individual children and custodial parents, and therefore it does not constitute a federal right." *Id.* at 343, 117 S. Ct. at 1361. Moreover, the Supreme Court stated the Ninth Circuit erred in "taking a blanket approach to determining whether Title IV-D creates rights." *Id.* at 344, 117 S. Ct. at 1361. "Only when the complaint is broken down into manageable analytic bites," the Supreme Court asserted, "can a court ascertain whether each separate claim satisfies the various criteria we have

set forth for determining whether a federal statute creates rights." *Id.* at 342, 117

S. Ct. at 1360.

In reaching this holding, the *Blessing* Court set forth three prerequisites for

establishing that a federal statute confers rights enforceable under § 1983.

> First, Congress must have intended that the provision in question
> benefit the plaintiff. Second, the plaintiff must demonstrate the right
> assertedly protected by the statute is not so "vague and amorphous"
> that its enforcement would strain judicial competence. Third, the
> statute must unambiguously impose a binding obligation on the
> States. In other words, the provision giving rise to the asserted right
> must be couched in mandatory, rather than precatory, terms.

*Id.* at 340–41, 117 S. Ct. at 1359 (citations omitted). However, "[e]ven if a

plaintiff demonstrates that a federal statute creates an individual right, there is only

a rebuttable presumption that the right is enforceable under § 1983." *Id.* at 341,

117 S. Ct. at 1360. To rebut this presumption, the state must demonstrate

Congress intended to foreclose a remedy under § 1983 either "expressly, by

forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a

comprehensive enforcement scheme that is incompatible with individual

enforcement under § 1983." *Id.*

In *Gonzaga University v. Doe*, the Supreme Court clarified the first of

*Blessing*'s three requirements, making clear that only unambiguously conferred

rights, as distinguished from mere benefits or interests, are enforceable under

13

§ 1983. *See* 536 U.S. 273, 283, 122 S. Ct. 2268, 2275 (2002). Specifically, the Supreme Court asserted if a federal statute's text and structure "provide some indication that Congress may have intended to create individual rights, and some indication it may not have, that means Congress has not spoken with the requisite 'clear voice.' Ambiguity precludes enforceable rights." *31 Foster Children v. Bush*, 329 F.3d 1255, 1270 (11th Cir. 2003) (citing *Gonzaga*, 536 U.S. at 280, 122 S. Ct. at 2273). To determine whether Congress intended the provisions in question to benefit the plaintiff, a court must weigh three factors: "whether the statute (1) contains 'rights-creating' language that is individually focused; (2) addresses the needs of individual persons being satisfied instead of having a systemwide or aggregate focus; and (3) lacks an enforcement mechanism through which an aggrieved individual can obtain review." *Id.*

*Gonzaga* involved a plaintiff who attempted to bring an action under § 1983 to enforce provisions of the Family Educational Rights and Privacy Act of 1974 (FERPA), which Congress enacted pursuant to its spending power. *See Gonzaga*, 536 U.S. at 276, 122 S. Ct. at 2271. FERPA provides in relevant part: "No funds shall be made available . . . to any educational agency or institution which has a policy or practice of permitting the release of education records . . . of students without the written consent of their parents . . . ." 20 U.S.C. § 1232g(b)(1). Under

14

§ 1234c(a), the Secretary of Education may terminate funding only if the educational agency or institution fails to "comply substantially" with FERPA's requirements.

Under the first *Gonzaga* factor, the Supreme Court determined FERPA does not contain rights-creating language because it speaks only to the Secretary of Education, directing the Secretary to deny federal funds if the prohibited release of education records takes place. *Id.* at 287, 122 S. Ct. at 2277. Second, the Supreme Court stated FERPA has an aggregate rather than individual focus, because educational agencies and institutions remain eligible for funding so long as they "comply substantially" with FERPA on a systemwide, rather than student-by-student, basis. *See id.* at 288, 122 S. Ct. at 2278. The Supreme Court noted its conclusion on this issue was "not unlike *Blessing*, which found that Title IV-D failed to support a § 1983 suit in part because it only required 'substantial compliance' with federal regulations." *Id.* Third, the Supreme Court determined FERPA's provisions empowering the Secretary of Education to "deal with violations" and requiring the Secretary to establish a review board constituted an enforcement mechanism for aggrieved individuals. *Id.* at 289–90, 122 S. Ct. at 2278–79. Accordingly, the Supreme Court held all three factors weighed in favor

of finding "spending legislation drafted in terms resembling those of FERPA can[not] confer enforceable rights." *Id.* at 279, 122 S. Ct. at 2273.

We first applied *Gonzaga*'s analytical framework in *31 Foster Children*. A group of foster children argued §§ 675(5)(D) and (E) of Title IV-E of the Social Security Act, which pertain to the states' case review systems for foster children, provided them rights enforceable under § 1983. *See 31 Foster Children*, 329 F.3d at 1268. Enacted under Congress's spending power, Title IV-E establishes a program of federal payments to states for foster care and adoption assistance. *See id.* at 1270. Pursuant to §§ 675(5)(D) and (E), "case review system" means a procedure for ensuring (1) "a child's health and education record . . . is reviewed and updated, and supplied to the foster parent or foster care provider with whom the child is placed, at the time of each placement of the child in foster care," and, (2) in the case of certain at-risk foster children, "the State shall file a petition to terminate the parental rights of the child's parents." *Id.* at 1270–71.

First, even though §§ 675(5)(D) and (E) contain language requiring the state to take certain actions relative to individual foster children (e.g., "*the State shall file a petition*"), we determined "§§ 675(5)(D) and (E) do not have the kind of focused-on-the-individual, rights-creating language required by *Gonzaga*." *See id.* at 1272 ("The references to individual children and their placements are made in

16

the context of describing what the procedure is supposed to ensure, and such provisions 'cannot make out the requisite congressional intent to confer individual rights enforceable by § 1983.'" (quoting *Gonzaga*, 536 U.S. at 289, 122 S. Ct. at 2278)). Second, we reasoned the "substantial conformity" requirement in Title IV-E is "similar to FERPA's, which the Court in *Gonzaga* concluded showed an aggregate instead of an individual focus." *Id.* (citing *Gonzaga*, 536 U.S. at 288, 122 S. Ct. at 2278). Third, although we acknowledged Title IV-E does not contain a comprehensive enforcement scheme, we determined the first two factors "point in the other direction and prevent us from saying that Congress spoke with a clear voice to unambiguously manifest its intent to create enforceable rights." *Id.* at 1272–73. Accordingly, we held §§ 675(5)(D) and (E) failed under *Gonzaga*'s three-factor analysis and, hence, did not satisfy the first *Blessing* requirement. *Id.* at 1274.

In summary, when a plaintiff claims a statutory provision creates individual rights enforceable under § 1983, she must establish all three requirements set forth in *Blessing*. The first *Blessing* requirement instructs us to determine whether Congress intended that the provision in question benefit the plaintiff. To decide whether the provision satisfies this first *Blessing* requirement, we must weigh the three factors set forth in *Gonzaga*. Specifically, we must consider whether the

17

provision (1) contains individually focused, rights-creating language; (2) has an individual, rather than systemwide or aggregate, focus; and (3) lacks an enforcement mechanism for aggrieved individuals. If we determine these three *Gonzaga* factors weigh against a finding that Congress intended the provision to benefit the plaintiff, then the provision does not satisfy the first *Blessing* requirement and the plaintiff's claim must fail.

2.      *Application of this Legal Framework to § 657*

Turning to this appeal, we must weigh each of the three *Gonzaga* factors to determine whether § 657 satisfies the first requirement of *Blessing*'s three-part test. If § 657 does not satisfy *Blessing*'s first requirement, then it does not provide Appellants with individual rights, enforceable under § 1983, to distribution of child support payments in strict compliance with § 657.

a.      *Individually Focused, Rights-Creating Language*

Like the provisions at issue in *Gonzaga* and *31 Foster Children*, § 657 does not contain individually focused, rights-creating language under the first *Gonzaga* factor. In *Gonzaga*, the Supreme Court pointed to Title VI of the Civil Rights Act of 1964 and Title IX of the Education Amendments of 1972 as examples of explicit rights-creating language. *See* 536 U.S. at 284 n.3, 122 S. Ct. at 2276 n.3. Titles VI and IX each provide: "No person . . . shall . . . be subjected to

18

discrimination." 42 U.S.C. § 2000d; 20 U.S.C. § 1681(a). According to the Supreme Court, "[w]here a statute does not include this sort of explicit 'right- or duty-creating language,' we rarely impute to Congress an intention to create a private right of action." *Gonzaga*, 536 U.S. at 284 n.3, 122 S. Ct. at 2276 n.3 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690 n.13, 99 S. Ct. 1946, 1955 n.13 (1979); *Alexander v. Sandoval*, 532 U.S. 275, 288, 121 S. Ct. 1511, 1520–21 (2001)).

The FERPA language addressed in *Gonzaga* speaks only to the Secretary of Education, instructing the Secretary to withhold funds from educational agencies and institutions with prohibited policies and practices; it does not speak directly to individual students. *Id.* at 287, 122 S. Ct. at 2277. Therefore, the Supreme Court concluded FERPA's language fell short of the quintessential rights-creating language found in Titles VI and IX. *Id.* Similarly, § 657's language speaks only to the states, instructing them to distribute child support payments in a certain fashion; it does not speak directly to individual custodial parents. Thus, the language in both FERPA and § 657 is at least one step removed from speaking of individually enforceable private rights, and does not evince Titles VI and IX's "'unmistakable focus on the benefitted class.'" *See id.* at 284, 122 S. Ct. at 2275 (quoting *Cannon*, 441 U.S. at 691, 99 S. Ct. at 1955). In the absence of explicit

19

rights-creating language, § 657 is at best ambiguous.  And as *Gonzaga* made clear, "[a]mbiguity precludes enforceable rights."  *31 Foster Children*, 329 F.3d at 1270 (citing *Gonzaga*, 536 U.S. at 280, 122 S. Ct. at 2273).

Furthermore, our conclusion comports with *31 Foster Children*.  Sections 675(5)(D) and (E) of Title IV-E refer to an individual foster "child" but do so only to describe the case review procedure's general mission.  *Id.* at 1272.  Likewise, § 657 repeatedly refers to the individual recipient "family," but does so only to explain how the state generally must distribute child support funds.  Moreover, similar to the phrase "*the State shall* file a petition" in § 675(5)(E), the phrase "*the State shall*" permeates § 657 and prefaces the procedures by which states must distribute child support funds they collect under Title IV-D.  According to *31 Foster Children*, such language gives § 657 "an aggregate or system wide focus instead of one that indicates concern with whether the needs of any particular [individual] are met."  *Id.*  Under *Gonzaga* and *31 Foster Children*, § 657 therefore does not contain rights-creating language, and the first *Gonzaga* factor is not satisfied.[10]

---

[10]  Appellants argue *Blessing* "specifically recogniz[es] a provision in § 657 directing payment of support to a custodial parent [as] exemplif[ying] rights creating language."  To support this assertion, Appellants point to the following dicta from *Blessing*:  "We do not foreclose the possibility that some provisions of Title IV-D give rise to individual rights. . . . Although § 657 *may* give [the plaintiff] a federal right to receive a specified portion of the money collected on her behalf by Arizona, she did not explicitly request such relief in the

b.      *Individual, Rather than Systemwide or Aggregate, Focus*

As we discussed in Part III.A.1, the Supreme Court and our circuit have repeatedly held "substantial compliance" provisions in Spending Clause legislation are inconsistent with individually enforceable rights.  Beginning with *Blessing*, the Supreme Court addressed § 609(a)(8), Title IV-D's substantial compliance provision, and concluded:  "Far from creating an *individual* entitlement to services, the [substantial compliance] standard is simply a yardstick for the Secretary to measure the *systemwide* performance of a State's Title IV-D program."  520 U.S. at 343, 117 S. Ct. at 1361 (emphasis in original).  Next, in *Gonzaga*, the Supreme Court extended *Blessing*'s reasoning to hold FERPA's "comply substantially" provision indicated an aggregate rather than individual focus under the second *Gonzaga* factor.  536 U.S. at 288, 122 S. Ct. at 2278.  In *31 Foster Children*, our circuit determined the "substantial conformity" requirement at issue was "similar to FERPA's, which the Court in *Gonzaga* concluded showed an aggregate instead of an individual focus."  329 F.3d at 1272.

---

complaint."  520 U.S. at 345–46, 117 S. Ct. at 1362 (emphasis added).  This quotation not only appears in dicta, but also includes the qualifying word "may."  Thus, contrary to Appellants assertions, *Blessing* does not stand for the proposition that § 657 contains rights-creating language.

21

This appeal brings the analysis full circle, requiring us to determine whether Title IV-D's "substantial compliance" provision—the same provision addressed in *Blessing*—indicates § 657 has a systemwide or aggregate, rather than individual, focus under the second *Gonzaga* factor. Based on the precedent set forth in *Blessing*, *Gonzaga*, and *31 Foster Children*, we conclude it does.

c. *Lack of an Enforcement Mechanism for Aggrieved Individuals*

As for *Gonzaga*'s third factor, § 657 lacks a remedial scheme sufficiently comprehensive to demonstrate congressional intent to preclude the remedy of suits under § 1983. Nevertheless, the "lack of an enforcement mechanism by which an aggrieved individual can obtain review is but one of the factors we consider." *Id.* at 1273. The other two factors counsel in favor of finding Congress did not "[speak] with a clear voice to unambiguously manifest its intent to create enforceable rights." *Id.* Without such an unambiguous intent, Appellants cannot satisfy the first requirement of the *Blessing* test. We thus hold § 657 does not confer a private right to distribution of child support payments enforceable under

§ 1983.[11] The district court did not err in granting DHR and AOC summary judgment on this issue.

B.     *Constitutional Claims:  Procedural Due Process*

The Arrington Appellants, all of whom are current or former TANF recipients, contend the notices DHR currently provides do not satisfy the Due Process Clause of the Fourteenth Amendment.  First, they argue DHR fails to provide adequate notice pertaining to its collection, distribution, and disbursement of their Title IV-D child support payments.  Second, they assert the publicly available statutes, regulations, and agency policy manuals regarding DHR's hearing process do not provide adequate notice of their right to a hearing and the procedures for requesting one.

The Due Process Clause of the Fourteenth Amendment provides no state "shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1.  "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. 247, 259, 98 S.

---

[11] The Eighth Circuit reached a similar conclusion in *Walters v. Weiss*, 392 F.3d 306 (8th Cir. 2004).  Although the Eighth Circuit acknowledged "§ 657(a) reflects some congressional intent to benefit custodial parents," it determined "the *right* plaintiffs assert . . . is not unambiguously imposed in § 657(a) as a binding obligation on the states." *Id.* at 313 (emphasis in original).  Accordingly, the Eighth Circuit held § 657 does not create an individually enforceable federal right. *Id.*

Ct. 1042, 1050 (1978). "In this circuit, a § 1983 claim alleging a denial of procedural due process requires proof of three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) constitutionally-inadequate process." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003) (citing *Cryder v. Oxendine*, 24 F.3d 175, 177 (11th Cir. 1994)). DHR's involvement in collecting, distributing, and disbursing child support payments constitutes "state action" under the second element of the *Grayden* test. Thus, only the first and third elements are at issue on appeal.

1.    *Deprivation of a Constitutionally-Protected Property Interest*

Under the first element of the *Grayden* test, we must consider whether the Arrington Appellants have shown not only a constitutionally-protected property interest, but also a governmental deprivation of that constitutionally-protected property interest. *See Grayden*, 345 F.3d at 1232 (stating the plaintiff-tenants satisfied the first element of the *Grayden* test because they (1) enjoyed a constitutionally-protected property interest in continued residency at their apartments and (2) were deprived of that interest upon eviction).[12] Property

---

[12] The Arrington Appellants contend they do not have to show a deprivation of their child support payments to trigger the procedural requirements of the Due Process Clause. Rather, they seem to imply they have satisfied the first element of the *Grayden* test by showing the inherent *risk* of DHR mishandling their child support payments via human or computer error. This argument lacks merit for at least two reasons. First, it contradicts the Due Process Clause's plain language, which prohibits states from depriving a person of life, liberty, or property without due

24

interests stem not from the Constitution, but from such sources as statutes, regulations, ordinances, and contracts. *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576–77, 92 S. Ct. 2701, 2708–09 (1972). Whether these sources create a property interest must be decided by reference to state law. *Id.* at 577, 92 S. Ct. at 2709.

The Alabama courts have determined custodial parents possess a constitutionally-protected property interest in child support payments. *See Morgan County Dep't of Human Res. v. B.W.J.*, 723 So. 2d 689, 693 (Ala. Civ. App. 1998) ("[A custodial parent] has a property interest in having her child support order paid in full by [the non-custodial parent]."). Thus, we must

---

process of law, but says nothing about protecting a person from the mere risk of such deprivation.

Second, to the best of our knowledge, neither the Supreme Court nor our circuit has ever held a plaintiff can succeed on the merits of his or her procedural due process claim without first showing a deprivation of a constitutionally-protected liberty or property interest. In each case the Arrington Appellants cite to support their argument, the plaintiffs suffered a deprivation—not the mere risk of a deprivation. *See Carey*, 435 U.S. at 248, 98 S. Ct. at 1044 (involving students suspended from their public schools and, hence, deprived of their liberty interest in not being disciplined by a public school); *Fuentes v. Shevin*, 407 U.S. 67, 69–71, 92 S. Ct. 1983, 1988–89 (1972) (involving consumers deprived of their property interest in certain household goods when a sheriff seized those goods in accordance with a state replevin statute); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 311, 70 S. Ct. 652, 655–56 (1950) (involving trust fund beneficiaries deprived of their property interest in trust funds when a trustee obtained a final decree in state court terminating every right the beneficiaries otherwise would have had against the trustee); *Grayden*, 345 F.3d at 1232 (involving apartment tenants evicted from their apartments and, therefore, deprived of their property interest in continued residency). Thus, these cases undermine, rather than support, the Arrington Appellants' argument.

determine whether the Arrington Appellants have been deprived of this constitutionally-protected property interest.

As the district court held, the Arrington Appellants have failed to adduce evidence that DHR deprived them of their child support payments. In their briefs, the Arrington Appellants do not point to any evidence in the record suggesting they received less than their full child support payment, endured undue delay in receiving their payments, or had identifiable errors in their payments that DHR failed to correct. At least three times during oral argument, we asked the Arrington Appellants' counsel to direct our attention to such evidence in the record, but he failed to do so. In short, after extensive discovery, the Arrington Appellants could not produce a scintilla of evidence indicating they suffered a deprivation of their child support payments. Thus, they present no genuine issue of material fact regarding whether they were deprived of a constitutionally-protected property interest, and their procedural due process claims must fail under the first element of the *Grayden* test.

2. *Constitutionally Inadequate Process*

Even if the Arrington Appellants could show a deprivation of their child support payments, however, their procedural due process claims would still fail under the third element of the *Grayden* test. The Arrington Appellants challenge

26

the adequacy of (1) the notice DHR provides them regarding its handling of their child support payments, and (2) the notice of their right to and the procedures for requesting a hearing. We address each issue in turn.

a. *Notice of DHR's Handling of Child Support Payments*

The Arrington Appellants argue the monthly "Notice of Child Support Collections" and the perforated stub attached to their monthly child support payment check do not adequately enable them to determine the timing and accuracy of their child support payments. Specifically, they contend these monthly notices lack vital information about their payments and "explanations which will allow a parent to understand the distribution of each child support collection and to identify possible errors in distribution and delays in disbursement." Without these details and explanations, the Arrington Appellants argue, Title IV-D custodial parents have no way of discerning whether DHR has erroneously deprived them of their child support payments.

To determine what type of notice is adequate to satisfy the Due Process Clause, we apply the test set forth in *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S. Ct. 652 (1950). *See Dusenbery v. United States*, 534 U.S.

161, 167–68, 122 S. Ct. 694, 699 (2002); *Grayden*, 345 F.3d at 1242.[13]  Under the

*Mullane* standard, notice must be "reasonably calculated, under all the

circumstances, to apprise interested parties of the pendency of the action and

afford them an opportunity to present their objections."  *Mullane*, 339 U.S. at 314,

70 S. Ct. at 657.  Due process is a flexible concept that varies with the particular

circumstances of each case, and myriad forms of notice may satisfy the *Mullane*

standard.  *See Grayden*, 345 F.3d at 1239 n.17.  Our task is not to determine

---

[13]  The Arrington Appellants contend this Court should use the balancing test set forth in *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893 (1976), rather than the *Mullane* test, to address whether the notice DHR currently provides is adequate under the Due Process Clause. We disagree.  The Supreme Court's recent holding in *Dusenbery* sets forth the framework for determining whether we should apply *Mathews* or *Mullane* to a procedural due process claim. 534 U.S. at 167–68, 122 S. Ct. at 699.  In *Grayden*, we provided the following overview of this framework:

> The *Mathews* balancing test, which we employ to determine the "dictates of due process," helps us determine at what point in time notice of the opportunity to be heard is constitutionally required. . . . But when we are called on to consider what type of notice is adequate to meet the . . . notice requirement, we eschew the balancing test in *Mathews* and adopt [the] "more straightforward" approach [set forth in *Mullane*].

*Grayden*, 345 F.3d at 1242 (citation omitted) (citing *Dusenbery*, 534 U.S. at 167, 122 S. Ct. at 699).  The Arrington Appellants acknowledge DHR mails them the monthly Notice of Child Support Collections and payment check stubs, and they do not challenge the *timing* of these notices.  Rather, they challenge the *adequacy* of the monthly notices.  Accordingly, we must apply the *Mullane* standard to their claim.

The Arrington Appellants also urge us to follow the Ninth Circuit's reasoning in *Barnes v. Healey*, 980 F.2d 572 (9th Cir. 1992).  Again, we disagree.  In *Barnes*, the Ninth Circuit determined the Due Process Clause required the State of California to send custodial parents notices containing detailed explanations of its handling of their child support payments.  *See id.* at 577–80.  To reach this conclusion, however, the Ninth Circuit applied the *Mathews* balancing test, rather than the *Mullane* test.  *See id.* at 577.  In light of the Supreme Court's subsequent ruling in *Dusenbery*, we conclude the Ninth Circuit's holding in *Barnes* carries little persuasive value.

28

whether the notice the Arrington Appellants request would be *ideal* under all the circumstances, but rather whether the notice they currently receive is *reasonable* under all the circumstances.

Section 654(5) of Title IV-D requires states to provide Title IV-D custodial parents notice "on a monthly basis . . . of the amount of the support payments collected." Accordingly, DHR mails the monthly Notice of Child Support Collections to Title IV-D custodial parents. These notices contain five columns listing the (1) non-custodial parent name, (2) court order, (3) amount paid to current, (4) amount paid to arrears, and (5) amount paid to family.

Based on this information, custodial parents can confirm DHR accurately recorded the non-custodial parent's child support payment amount by comparing the dollar figure appearing on their court order[14] with the dollar figure appearing under the "amount paid to current" column. To then determine what amount (if any) DHR withheld as reimbursement for TANF funds, they can check the dollar figure appearing under the "amount paid to arrears" column. Finally, they can ensure they received the amount DHR purportedly owed by comparing the amount

---

[14] Under Title IV-D, states must send each custodial parent a copy of his or her child support court order and all modifications of the court order. § 654(12)(B).

appearing on their payment check stub with the dollar amount appearing in the "amount paid to family" column.

If custodial parents still have questions or concerns after reviewing their monthly Notice of Child Support Collections, the payment check stub reminds them to contact DHR's toll-free, 24-hour automated voice response hotline or visit DHR's web page for additional information. DHR's 24-hour hotline not only provides custodial parents with updated balance information, but also gives them the option to speak directly with a child support worker at DHR's Customer Service Unit (CSU). Parents may also directly call, fax, write, e-mail, or visit the CSU during regular business hours for information and assistance. Additionally, custodial parents may contact the CSU or visit DHR's website to obtain a copy of their "Court Order Payment Summary," which provides a year-to-date summary of their payments and includes detailed information about the timing and accuracy of these payments.[15]

The monthly Notice of Child Support Collections—coupled with the payment check stub, the 24-hour hotline, the CSU, and the Court Order Payment

---

[15] The record indicates custodial parents utilize these additional information sources. In Fiscal Year 2002, for example, the CSU responded to 3176 direct telephone calls, 42,374 telephone calls initiated through the 24-hour hotline, 1679 e-mails, and 980 letters. Also, between September 2002 and February 2003, DHR's 24-hour hotline received an average of 505,465 calls per month.

Summary—give Title IV-D custodial parents ample information with which to determine whether they have received their full child support payments in a timely manner. Considering all the circumstances, we conclude DHR's monthly notices are reasonably calculated to inform custodial parents of the action DHR has taken with regard to their child support payments. Accordingly, the Arrington Appellants' procedural due process claim with respect to DHR's notice fails.

b.    *Notice of the Right to and the Procedures for Requesting a Hearing*

The Arrington Appellants also contend the Due Process Clause requires DHR to provide them individualized, contemporaneous notice of their right to a hearing and the procedures for obtaining one. Specifically, they assert either the Notice of Child Support Collections or the payment check stub should include a statement informing Title IV-D custodial parents of not only their right to an administrative hearing, but also the procedure for initiating such a hearing.

In response, DHR points to the public availability of Alabama statutes, administrative rules, and agency policy manuals, which set forth the procedures for pursuing administrative remedies. According to DHR, the Supreme Court's holding in *City of West Covina v. Perkins*, 525 U.S. 234, 119 S. Ct. 678 (1999), establishes these publicly available sources, standing alone, provide adequate

31

contemporaneous notice of custodial parents' right to, and the procedures for, requesting a hearing.

In *Grayden*, we applied *West Covina* to a procedural due process claim for the first time. 345 F.3d at 1238–44. *Grayden* involved a group of tenants who claimed the city violated their procedural due process rights when a city code enforcement officer condemned their apartment complex and evicted them from their apartments. *Id.* at 1227. The condemnation notices posted on the tenants' doors stated they had 36 hours to vacate the premises, but did not inform them of their right to a hearing or the procedures for requesting one. *Id.* at 1228. Although the city argued a city code section provided tenants adequate contemporaneous notice of their right to a hearing, the tenants asserted the Due Process Clause entitled them to individualized notice. *See id.* at 1238.

We began by noting "[f]or one hundred years, the Supreme Court has declared that a publicly available statute may be sufficient to provide . . . notice because individuals are presumptively charged with knowledge of such a statute." *Grayden*, 345 F.3d at 1239 (citing *Reetz v. Michigan*, 188 U.S. 505, 509, 23 S. Ct. 390, 392 (1903); *N. Laramie Land Co. v. Hoffman*, 268 U.S. 276, 283, 45 S. Ct. 491, 494 (1925); *Texaco, Inc. v. Short*, 454 U.S. 516, 532, 102 S. Ct. 781, 793 (1982); *Atkins v. Parker*, 472 U.S. 115, 130–31, 105 S. Ct. 2520, 2529–30 (1985)).

This century-long line of cases, we asserted, culminated in the Supreme Court's acknowledgment in *West Covina* "that notice of the right to a hearing can be provided by 'published, generally available statutes and case law,' 'public sources,' 'any publicly available document,' and 'documents accessible to the public.'" *See id.* at 1241–42 (citing *West Covina*, 525 U.S. at 241, 242, 119 S. Ct. at 681, 682). We read *West Covina*, moreover, as making "clear that . . . the sophistication of the affected individuals and the health and safety implications of the deprivation . . . , standing alone, are not sufficient to impose an affirmative [notice] obligation on [government] officials." *Id.* at 1241.[16] Based on this precedent, we determined the city made "a compelling argument that [the city code section], standing alone, provides contemporaneous notice to the tenants of their right to challenge the condemnation order and thus satisfies due process." *Id.* at 1240.

---

[16] The Arrington Appellants contend the Supreme Court's holding in *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 98 S. Ct. 1554 (1978), requires DHR to provide custodial parents individualized notice of administrative remedies and procedures. This argument lacks merit, because the Supreme Court has clarified *Memphis Light* only mandates individualized notice when publicly available documents do not describe the administrative procedures at issue. *West Covina*, 525 U.S. at 242, 119 S. Ct. at 682 ("While *Memphis Light* demonstrates that notice of the procedures for protecting one's property interests may be required when those procedures are arcane and not set forth in documents accessible to the public, it does not support a general rule that notice of remedies and procedures is required.").

Yet, our analysis did not end there. "[W]hile *West Covina* repudiates a general rule that the government always must provide affirmative notice of the right to and procedures for requesting a hearing, *West Covina* does not stand for the converse proposition that statutory notice is always sufficient to satisfy due process." *Id.* at 1244. Accordingly, we held the *Mullane* standard still required us to consider whether, in light of all the circumstances, the city code was reasonably calculated to inform the tenants of their procedural rights. *Id.* at 1243. In conducting our *Mullane* analysis, we recognized "there is no presumption that all of the citizens actually know all of the law all of the time . . . [and] citizens must educate themselves about the law before they can wield the rights dedicated to them under it." *Id.* Considering the tenants had less than 36 hours to vacate their homes, make alternate arrangements for shelter, work, and school, and locate and read the city code section pertaining to hearings, we held the city code section, standing alone, was not reasonably calculated under all the circumstances to inform the tenants of their administrative remedies. *Id.*

Here, Alabama's statutes, regulations, and publicly available agency manuals provide custodial parents notice of their right to a hearing and the procedures for obtaining one. First, the Alabama Administrative Procedure Act (AAPA) "provide[s] a minimum procedural code for the operation of all state

34

agencies when they take action affecting the rights and duties of the public." Ala. Code § 41-22-2(a) (1975). Among the AAPA's basic procedural protections is the guarantee, "[i]n a contested case, that all parties shall be afforded an opportunity for hearing after reasonable notice in writing." § 41-22-12(a). As part of the Alabama Code, the AAPA is publicly available at a variety of locations. *See, e.g.*, § 41-21-1.

Second, the Alabama Department of Human Resources Child Support Division Administrative Code (the Administrative Code) sets forth the rules and procedures governing hearings related to DHR's administration of Title IV-D. *See* Ala. Admin. Code r. 660-3-15.01 (2005). The Administrative Code stipulates a custodial parent's "request for a hearing must be filed in writing within 30 days following the action (or inaction) with which he is dissatisfied or 30 days following the claimant's learning of said action." Ala. Admin. Code r. 660-3-15.02(2). It also sets forth the information custodial parents must provide and the format they must follow in their written request for a hearing. Ala. Admin. Code r. 660-3-15.02(3). Under the AAPA, DHR must keep a permanent register of its administrative rules open to public inspection. Ala. Code § 41-22-6(a). Thus, the Administrative Code is publicly available.

Third, DHR has adopted a Child Support Policy and Procedures Manual (CSPPM), which contains a section devoted to educating DHR's employees about the agency's administrative hearing policy. Under Alabama law, the CSMPP is available to the public. *See* § 36-12-40 ("Every citizen has a right to inspect and take a copy of any public writing of th[e] state . . . ."). Similar to the city code section at issue in *Grayden*, the relevant provisions of the AAPA, Administrative Code, and CSPPM combine to notify Title IV-D custodial parents of their right to a hearing and the procedures for obtaining one.

As in *Grayden*, however, we cannot end our analysis here. Rather, under the *Mullane* standard, we must also consider the adequacy, under all the circumstances, of this notice. Unlike the tenants in *Grayden*, Alabama's custodial parents have significantly more than 36 hours to locate the relevant public documents and invoke their right to a hearing. From the time a custodial parent learns DHR has erroneously deprived her of a child support payment, to the time her right to a hearing expires, she has 30 days in which to locate and read the statutes, regulations, and publicly available documents discussed above, and submit a written request for a hearing. We conclude this one-month window constitutes a reasonable amount of time under the *Mullane* standard.

36

Moreover, DHR offers services to help custodial parents educate themselves about their right to a hearing and the procedures for requesting one. When DHR opens a child support case, for example, it sends the custodial parent a document entitled "A Child Support Client's Basic Rights." Among other things, this document alerts custodial parents to their right "[t]o request a departmental hearing regarding actions in [their] case." Custodial parents can also contact the CSU to learn how to invoke this right if they suffer a deprivation of their child support payments. Because the CSU's social workers must provide custodial parents "[a] written statement concerning the right to appeal, and the methods by which these rights may be exercised . . . when requested," Ala. Admin. Code r. 660-3-15.01(3), they can obtain the requisite information directly from DHR without having to research Alabama's statutes, regulations, and agency policy manuals independently.

In summary, custodial parents (1) receive notice of their right to a hearing upon enrolling in DHR's child support system; (2) can learn more about this right by calling the CSU; and (3) have 30 days after learning of a deprivation of their child support payments in which to locate and read the statutes, regulations, and public documents pertaining to DHR's hearing process. Based on these surrounding circumstances, we hold the relevant provisions of the AAPA,

37

Administrative Code, and CSPPM are reasonably calculated to provide custodial parents contemporaneous notice of their right to and the procedures for requesting a hearing. The Arrington Appellants' procedural due process claim therefore also fails on this issue, and the district court did not err in granting summary judgment to DHR.

## IV. CONCLUSION

For the foregoing reasons, we conclude the district court did not err when it granted summary judgment to DHR and AOC. When Congress enacted § 657 of Title IV-D, it did not speak with a clear voice to unambiguously manifest an intent to create enforceable rights. Pursuant to the precedent set forth in *Blessing*, *Gonzaga*, and *31 Foster Children*, Appellants have thus failed as a matter of law to establish § 657 provides custodial parents individual rights, enforceable under § 1983, to distribution of their payments in strict compliance with § 657. Furthermore, under the standard set forth in *Grayden*, the Arrington Appellants have failed as a matter of law to show a violation of their § 1983 procedural due process rights.

AFFIRMED.